**STATE ex rel. KING, Atty. Gen., v. ROWE.**

No. 22064. Opinion Filed June 9, 1931.

J. Berry King, Atty. Gen., and F. M. Dudley, Asst. Atty. Gen., for petitioner.

Edwin Dabney, for respondent.

RILEY, J. This is an original action in the nature of quo warranto prosecuted in the name of the state of Oklahoma on the relation of the Attorney General at the direction of the Governor. Epitomized, the facts to be drawn from the petition and response are:

On November 7, 1930, Judge Chappell, a regularly elected member of the Criminal Court of Appeals of the state of Oklahoma, certified to Honorable W. J. Holloway, then Governor, his disqualifications to sit in the consideration and determination of two causes pending before the said court, the same being causes A-7547 and A-7591, both styled, "State of Oklahoma v. Sam Ingram." On the same day the then Governor appointed and commissioned the respondent, Prentiss E. Rowe, as a special judge of said court in lieu of Judge Chappell, disqualified, to sit in the consideration and final determination of the said Ingram causes. On November 10, 1930, Judge Rowe, so appointed and commissioned, qualified by taking and subscribing to the prescribed oath as required by law, and assumed the duties as a member of said court. On January 2, 1931, the Criminal Court of Appeals, composed of Honorable James S. Davenport, Presiding Judge, Honorable Thomas A. Edwards, a regularly elected judge, and the respondent aforesaid, special judge, rendered a decision in each of said Ingram causes based upon opinions prepared by the respondent Rowe. The Ingram causes were reversed by said decisions, the Honorable James S. Davenport, Judge, concurring therein and the Honorable Thomas A. Edwards dissenting therein.

On January 16, 1931, the state, as a party to the Ingram causes, filed in said court a petition for rehearing, and on the 15th day of January, 1931, the present Governor, Honorable William H. Murray, issued an executive order having for its apparent purpose the cancellation of the commission and appointment theretofore issued and heretofore described, under and by virtue of which the respondent, Judge Rowe, was then serving in said judicial capacity. This executive order reads as follows:

"January 15th, 1931.
"Gus Poole, Clerk, Supreme Court
"And Ex-Officio Clerk Criminal
"Court of Appeals,
"Building.
"Dear Mr. Poole:
"This is to advise you that I have this day canceled and set aside the appointment of Honorable Prentiss E. Rowe of Pawnee, Okla., as Special Judge of the Criminal Court of Appeals of the state of Oklahoma for the Northern District, in causes A-7547 and A-7591, Sam Ingram v. State of Oklahoma, this cancellation to take effect immediately upon receipt of the same by you.
"Yours very truly,
"(Signed) Wm. H. Murray,
"Governor."

On the same day said Governor issued an order having for its purpose the appointment of Honorable J. T. Dickerson, by virtue of which it was sought to designate him to act in lieu of Honorable William H. Chappell, disqualified, and instead of respondent, Honorable Prentiss E. Rowe, for the consideration and final determination of the said Ingram causes. This order was as follows:

"January 15, 1931.
"Gus Poole, Clerk of the Supreme Court
"And Ex-Officio Clerk of the
"Criminal Court of Appeals,
"Building.
"Dear Mr. Poole:
"This is to advise you that I have appointed Honorable J. T. Dickerson, of Edmond, Okla., as Special Judge of the Criminal Court of Appeals of the state of Oklahoma, for the Northern District, in cases A-7547 and A-7591, Sam Ingram v. State of Oklahoma. Judge Dickerson is succeeding Will H. Chappell, member of the Criminal Court of Appeals, disqualified.

"Said appointment to remain in full force and effect through and until the final determination of said cause in the Criminal Court of Appeals of the state of Oklahoma.
"Yours very truly,
"(Signed) Wm. H. Murray,
"Governor."

On January 16, 1931, Honorable J. T. Dickerson subscribed to the oath of office as by statute provided.

On January 17, 1931, Honorable Thomas A. Edwards and Honorable J. T. Dickerson, assuming to act as a majority of said court, promulgated an order purporting to grant a rehearing in the said Ingram causes. On the same day Honorable James S. Davenport and the Honorable Prentiss E. Rowe, respondent, assuming to act as a majority

of said court, promulgated an order purporting to deny rehearing in the said Ingram causes and directing the issuance of mandate therein.

On January 17, 1931, Honorable William H. Murray, Governor, issued an executive order to the Attorney General of the state of Oklahoma, directing the institution of an action to test the authority under which Honorable Prentiss E. Rowe assumed to act as herein stated.

In compliance with the last-mentioned executive order the Attorney General filed petition herein on January 23, 1931, and response was filed February 2nd thereafter. On May 16, 1931, a supplement to response was filed by permission of court.

This court assumes jurisdiction by reason of section 2, art. 7, Constitution of Oklahoma, which provision, after granting to this court the power to issue remedial writs, continues:

"And the Supreme Court may exercise such other and further jurisdiction as may be conferred upon it by law. * * *"

And by reason of section 458, C. O. S. 1921, as amended by ch. 96, S. L. 1925, in part reading as follows:

"The writ of quo warranto and proceedings by information in the nature of quo warranto are abolished and remedies heretofore obtainable in those forms may be had by civil action."

And by reason of section 459, C. O. S. 1921, reading:

"Such action may be brought in the Supreme Court or in the district court in the following cases: First. When any person shall usurp, intrude into or unlawfully hold or exercise any public office. * * * Sixth. For any other cause for which a remedy may have heretofore been obtained by writ of quo warranto. * * *"

And by reason of the publici juris nature of the unusual situation. Also by virtue of section 2, art. 7, Constitution of Oklahoma, wherein is extended the original jurisdiction of the Supreme Court to a superintending control over all inferior courts and all commissions and boards created by law. Section 1, art. 7, Constitution. Jarman v. Mason, 102 Okla. 278, 229 Pac. 459; State ex rel. Ross, 76 Okla. 11, 183 Pac. 918; State ex rel. West v. Cobb, 24 Okla. 662, 104 Pac. 361; State v. Davenport, 125 Okla. 1, 256 Pac. 340; Owens v. Dancy, 36 Fed. (2nd Series) 882.

The main question involved is stated by the Attorney General as follows:

"Does the Governor, after he has commissioned a person to sit as a special judge upon the Criminal Court of Appeals, in the place and stead of one of the regular judges of said court, in certain cases pending on appeal in said court, for decision, for the term 'through and until final determination of said cause in the Criminal Court of Appeals of the State of Oklahoma,' possess the right and authority to cancel, revoke and set aside such commission, and thereby remove such special judge from such office, prior to the final determination of said cases in said court, and commission another person in the place and stead of such disqualified regular judge in said cases?"

The Criminal Court of Appeals is not a court created by the Constitution of Oklahoma. It is a creature of statute existing by virtue of exercised permissive authority vested in the Legislature for its creation by section 2, art. 7, Constitution of Oklahoma. (S. L. 1909, p. 170; sections 3037 to 3055, C. O. S. 1921.)

In Chickasha Cotton Oil Co. v. Lamb & Tyner, 28 Okla. 275, 114 Pac. 333, this Supreme Court held:

"The Constitution provides for two classes of courts: those specifically created by the Constitution and those authorized to be created by legislative enactment. Those created by the provisions of the Constitution are divided into five classes, to wit: The Supreme Court, the district courts, county courts, municipal courts and courts of justices of the peace. * * *"

It is observed that the Criminal Court of Appeals is not of these five classes. Consequently, and in view of the constitutional provision hereinafter cited, it is thought that the remedy for removal of judges of the Criminal Court of Appeals is not by impeachment as provided by section 1, art. 8, Constitution of Oklahoma:

"The Governor or other elective state officers, including the Justices of the Supreme Court, shall be liable and subject to impeachment for willful neglect of duty, corruption in office, habitual drunkenness, incompetency, or any offense involving moral turpitude committed while in office."

In Maben v. Rosser, 25 Okla. 588, 103 Pac. 674, the Supreme Court held a district judge, although a state officer, was not subject to impeachment, and further it was therein said:

"It is urged against such construction that it leaves no provisions for the impeachment of members of the Criminal Court of Ap-

peals, who are state officers in the fullest sense of the word, and that if they may be removed from office at all, it must be by some statutory provision. It may be said, in answer to this, that the Constitution, while authorizing the creation of a Court of Criminal Appeals, did not create such court, and it may not have been in the contemplation of the framers of the Constitution that such court would be created immediately, and it would not have been unreasonable in the framers of the Constitution and the people in adopting it to have intended to postpone the enactment of the law for the removal of such officers until the same were created. This criticism goes rather to the merits and policy of the provision than to its legal effect. The section, if construed as plaintiff contends for, would in a measure be subject to the same criticism, for it would then provide for the impeachment only of elective officers, and no constitutional provision exists whereby appointive officers are subject to impeachment, and a remedy or means for removal of such officers for official misconduct is left by the Constitution for legislative disposition."

However, there exists a constitutional provision applicable to the removal of nonimpeachable officers. It is section 2, art. 8, Constitution:

"All elective officers, not liable to impeachment, shall be subject to removal from office in such manner and for such cause as may be provided by law."

And section 6, art. 8, Constitution:

"The Legislature shall pass such laws as are necessary for carrying into effect the provisions of this article."

The Legislature has obeyed this constitutional mandate by enacting sections 2394 to 2425, inclusive, C. O. S. 1921.

Section 2394 provides:

"Any officer not subject to impeachment, elected or appointed to any state, county, township, city, town, or other office, under the laws of the state, may, in the manner provided in this article, be removed from office for any of the following causes:

"First: Habitual or willful neglect of duty.

"Second: Gross partiality in office.

"Third: Oppression in office.

"Fourth: Corruption in office.

"Fifth: Extortion or willful overcharge of fees in office.

"Sixth: Willful maladministration.

"Seventh: Habitual drunkenness.

"Eighth: Failure to produce and account for all public funds and property in his hands, at any settlement or inspection authorized or required by law."

Other causes for removal from office are provided in section 2413, C. O. S. 1921, which constitutes a part of what is known as the Attorney General's Bill.

Section 2395, C. O. S. 1921, provides procedure by grand jury action for removal from office of nonimpeachable officers upon presentation of an accusation in writing. So it is to be observed that said sections composing article 4, ch. 7, C. O. S. 1921, provide a complete remedy for the removal of nonimpeachable officers (except members of the Legislature). None of the things required to be done under the provisions of section 2394, et seq., as conditions precedent to removal of respondent from office have been performed.

It is asserted by the Attorney General that such provisions are not exclusive, for section 2, C. O. S. 1921, provides:

"The Governor shall have power to remove any officers appointed by him, in case of incompetency, neglect of duty, or malfeasance in office; and may then fill the same as provided in cases of vacancy."

It is our opinion that section 2, last quoted, is not applicable for the removal of the respondent, for the reason that the appointment herein sought to be vacated was a judicial appointment. There is no case presented and we know of none where, under a constitutional provision such as contained in section 1, art. 4, infra, it has been held that an executive could, by reason of a statute, or independent of statute, recall an appointment to office in an independent branch of government; whereas, on the other hand, there are many cases to the contrary, some of which are hereinafter cited.

Section 1, art. 4, Constitution of Oklahoma, reads as follows:

"The powers of the government of the state of Oklahoma shall be divided into three separate departments: the legislative, executive, and judicial; and except as provided in this Constitution, the legislative, executive and judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others."

It is urged that section 2, C. O. S. 1921, be considered in pari materia with the provisions of sections 2394-2425, C. O. S. 1921. This we cannot do, for we must consider the constitutional provisions under which the statutes exist. These constitutional provisions are sections 2 and 6 of article 8, and section 1 of article 4, supra. So considering the constitutional provisions, we find a lack of harmony when section 2 is considered in

pari materia with sections 2394-2425, supra. Conversely, when we consider sections 2394 to 2425, supra, as exclusive in remedy for the removal of a judicial officer nonimpeachable, and section 2, C. O. S. 1921, as applicable to executive officers only, the whole scheme of removal is workable and without incongruity, and without constitutional infraction.

In the case of City of Ardmore v. Sayre, 54 Okla. 779, 154 Pac. 356, this court held:

"The question now presented is whether the power or authority of the mayor to appoint, carries with it the power of removal. Such seems to be the general rule adopted in this state, unless prohibited by statute."

Therein it was held that the power to remove was prohibited by provisions of the charter.

Herein we hold the power to remove is prohibited by provision of the Constitution. Cameron v. Parker, 2 Okla. 277, 38 Pac. 14.

It is not to be understood that we hold the exercise of power to remove from office is necessarily a judicial matter. It is not so generally considered in this country. There are some authorities that hold a hearing to determine cause for removal is a judicial matter, but those authorities proceed upon the theory that there is a property right in the office—that it is a hereditament. That was true under the old common law of England, but in this country nothing is more foreign to the law or repulsive to our sense of free government, than that an office is created for some person's particular benefit, or that anyone should have a property right in it. Offices are created for the carrying on of the various departments of government.

The Cameron Case holds:

"No one has a right of property in an office such as would bar the executive from removing him if cause presented where the statute confers that power, or even without a statute, an executive officer may exercise the power of removal, **unless expressly prohibited**, for the power of appointment, under the laws, carries with it the power of removal under the law."

Withal the power to remove a judicial officer may be, as in this case, an exercise of the function of the judicial department of government inhibited by section 1, art. 4, of the Constitution, supra. Witness the fact that the special judge last purported to be appointed voted to grant a rehearing and to stay the mandate in the Ingram cases—saying at the time that he was not informed as to the merits of that controversy. We do not hold it to be true, but it is possible for an executive to direct a vote of one appointed by him, and it is possible that an executive could, if he possessed the power, recall a judge in the event he thought the judge's vote or action in error, and thus continue ad infinitum until he controlled the decision.

It is an axiom as old as the law, nemo potest facere per alium, quod per se non potest (no one can do through another what he cannot do himself). This axiom is especially applicable when a constitutional mandate is involved, for if the Constitution can be evaded by effecting indirectly that which cannot be done directly, the Constitution would furnish frail protection to the citizen. It would be at the mercy of ingenious efforts to circumvent its objects and to defeat its commands. Let such be the law and the independence of the judiciary becomes a myth. The constitutional mandate last cited, specifying that the departments of government "shall be separate and distinct," and providing as to the triune divisions of government, "neither shall exercise the powers properly belonging to either of the others," stands, if it stands for anything, for an independent judiciary.

We agree with the American doctrine that a grant of power to remove, either for cause or at discretion, carries with it the exclusive power to hear and decide; that the depository of the removing power is the sole judge of the sufficiency of the evidence to justify removal, but the question at bar is whether there is imposed in the executive the power to remove a judicial officer. It is not so imposed specifically, and in view of the constitutional provision, supra, for a separation of powers, it is evident that such power cannot be considered as imposed by implication, or by a statute general in its terms; indeed, it is doubtful whether by mere statute the power to invade and determine by removal and substitution the personnel of a separate department of government could be imposed in the executive in view of the constitutional provision which rises higher than mere statutory enactment.

In other words, it is our view that where the power to remove an officer is vested in the Governor, the exercise of that power is not a judicial function to the extent that it is an invasion of the judicial branch of government. On the other hand, as to whether the power to remove an officer of either the legislative or judicial departments of government has been or can be, under our Con-

stitution, vested in the Governor, is essentially a judicial question.

"The object of a written Constitution is to regulate, define, and limit the powers of government by assigning to the executive, legislative and judicial branches, distinct and independent powers. The safety of free government rests upon the independence of each branch and the even balance of power between the three. Unite any two of them and they will absorb the third with absolute power as a result. Weaken any one of them by making it unduly dependent upon another and a tendency toward the same evil follows. It is not merely for convenience in the transaction of business that they are kept separate by the Constitution, but for the preservation of liberty itself, which is ended by the union of the three functions in one man or in one body of men. * * * Nothing is more essential to free government than the independence of its judges, for the property and the life of every citizen may become subject to their control, and may need the protection of their power. Not a contract is made except in reliance upon their ability to afford redress if it is violated. Men part with property upon the promise of their fellows, walk the streets by day and sleep in peace at night in the confidence that the silent and unseen power of the judiciary is always ready to protect their rights." Peo. of the St. of N. Y. v. Howland, 155 N. Y. 270, 41 L. R. A. 838.

Mr. Justice Brandeis advances the view which impresses us as sound that:

"The doctrine of the separation of powers was adopted by the Convention of 1787 not to promote efficiency, but to preclude the exercise of arbitrary power. The purpose was not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy." Myers v. United States, 272 U. S. 107, 71 L. Ed. 160.

"Checks and balances," he said, "were established in our government in order that this should be 'a government of laws and not of men'," and repeated the words of White in the House of Representatives in 1789. An uncontrollable power of removal in the Chief Executive "is a doctrine not to be learned in American governments." "Such uncontrollable powers had been denied in Colonial charters, and even under proprietary grants and royal commissions and denied in the Thirteen States before the framing of the federal Constitution." Conn. Charter 1662; Ga. Charter 1732; Shepaid's Proprietary Gov. in Penn. 321-270.

Involved in the case at bar is the question of power as well as the manner of its exercise.

Edward J. White, in "Legal Antiquities," p. 91, recites that:

"From the reign of William the Conqueror, until that of King John, the administration of justice was still kept in the hands of the King, who was regarded as the source of all justice and law. * * *

"So dependent upon the will of the sovereign was the tenure of the judge, during the reign of Richard I, that we find William de Longchamp, Chief Judiciary and Chancellor, was removed from his office, by the intrigue of John, Earl of Morton, the King's brother.

"Judges were then but the servants of the king and he could move them about as mere pawns upon the chessboard of his own expediency, or dismiss them at a moment's notice, if they refused to do his bidding. * * *"

It was to prevent such abuses that the barons exacted from King John the various guaranties of the Great Charter and stipulation therein: "Right shall not be sold, delayed or denied," and that the king should only appoint "justiciaries, sheriffs and bailiffs of such as know the law of the land and are disposed duly to observe it." (Reeves History of English Law, 471, 472.) And it was to prevent abuses that our government perpetuated and extended the guaranties of an independent judiciary.

Mr. White says (pp. 94-95):

"The strange thing is that with such a system, any self-respecting man could be found to undertake the performance of functions such as those required of a judge, when his behavior was the means of ruining his future life, regardless of his pure intentions in the performance of his official duty.

"The tenure of office of the English judge continued for centuries, to be at the pleasure of the Crown, and under the Plantagenets and the Tudors, a Chief Justice even, might be removed, like any other officer of the King, at the pleasure of the sovereign, and during this whole period we find that the standards of the judiciary were in keeping with this servile and undignified conception of the duties of such an office, for the judges, with but few exceptions, during this period of servile attachment to the Crown, were men of but mediocre ability, willing to prostitute their high offices, to hold the esteem and favor of their patron.

"It was thus found, by experience, in England, that the proper discharge of the impartial duties of the courts was consistent only with the maintenance, at all times, of their dignity and independence, hence, it was enacted, by statute (13 William III, c. 2)

246

that the commissions of judges were to be held, not as formerly, during the mere pleasure of the king, but so long as they should conduct themselves uprightly. They can only be removed from office, upon the address of both houses of Parliament and since the reign of George III, the commissions of judges are not terminated with the death of the king, but they continue to hold their office, notwithstanding the demise of the king, during their good behavior, or until removed by the joint action of both houses of Parliament.

"And not only did the English law raise the incumbent of the judgment seat to a plane where he could view, with disdain, the frowns of the tyrant in the performance of his official functions, but that he might also be free from the clamors of the populace, he was exempt from indictment for any judicial act honestly done, or omitted, while sitting as a judge. In other words, while acting in a judicial capacity, judges were not liable for an honest mistake, but only for fraud or corruption."

After citing U. S. v. Guthrie, 17 How. 284, and State ex rel. Vail v. Draper, 48 Mo. 213, White states:

"It was accordingly held within the past century that neither the President nor the Governor could remove a judge during the term of office for which he was elected or appointed, but the only way to remove or recall a judge was by impeachment for criminal or corrupt conduct."

State ex rel. Vail v. Draper, supra, is a case wherein Governor McClurg commissioned Vail as a judge; thereafter Brown became Governor, and sought to commission Dinning to the same judicial position; the court held:

"When Governor McClurg, acting upon evidence which he doubtless deemed satisfactory, of Vail's election, issued a commission to him, the executive function, so far as commissioning a judge for that circuit was concerned, was exhausted. The commission invested Vail with the title, and was prima facie evidence of his right to the office. It gave him the possession, and he could only be deprived of it or ousted upon due process, in the manner prescribed by law. He exercised its duties and privileges by color of law, and that was sufficient till some other person legally established a better and a higher right

"After the Governor has issued his commission, and Vail had qualified and been inducted into office, it was incompetent for any subsequent governor, upon any evidence whatever, to attempt to nullify or revoke that commission and devolve the office upon another. * * * Such a proceeding would be the exercise of judicial rather than of executive powers.'"

As long ago as the case of Marbury v. Madison, 1 Cranch, 154, it was decided that when the tenure of an office was fixed, the President had no power over the officer. In that case justices of the peace were appointed by the President under the Act of Congress of 1801, by which act they were to hold their offices for five years. The court decided that Marbury, when once appointed to that judicial office, had a right to the office for five years prescribed by law, independent of the executive. 4 Elliott's Debates, Part II, 141-208.

The great debates of 1789 concerned whether the President had power to remove from office when the law was silent as to tenure, and the principal argument for the President's power was his responsibility for the acts of purely executive officers who were his agents. Such argument cannot extend to judicial officers.

Executive power is a relative term. We have read much about the power to create carrying with it the power to destroy; we have heard much about the power to appoint implying the power to remove; but such considerations are in regard to power absolute. Executive power under our government is not power in the abstract. It is not the executive power of the King of Siam or the Sultan of Turkey, but it is such executive power as rises out of the Constitution and laws of our state. It is exactly the power, in any given case, of carrying the particular law, as it stands, into execution. The sovereignty of Oklahoma is a unit, one government; the departments are but functionaries of that government, not hostile to each other, but co-ordinate, separate, but not antagonistic. When, therefore, either of the departments acts in its legitimate sphere, it is the sovereignty of Oklahoma which acts through its appropriate functionary. If the Legislature passes an act, it is the act of the government of Oklahoma by its appropriate organ. If the judiciary expound a statute, it is the exposition by the government through its peculiar organ, of its own enactment, and when "executive authority" and "executive power" (sections 1 and 2, art. 6, Const.) is vested in a Governor, it is only that power, in any given case, which is necessary in order to carry the particular law into execution, for "all political power is inherent in the people." Section 1, art. 2, Constitution.

See the case of the United States v. Guthrie, decided 1854, and arguments therein made. Observe that President Taylor commissioned the respondent as Chief Justice of

the Territory of Minnesota in 1849, for a term of four years; on October 22, 1851, the President thought proper to remove Goodrich and appoint Jerome Fuller. Justice McLean, expressing his views therein, well said:

"It is argued that, as the President is bound to see the laws faithfully executed, the power to remove unfaithful or incompetent officers is necessary. This may be admitted to be a legitimate argument as commonly applied to executive officers. My own view is that the power to see that the laws are faithfully executed, applies chiefly to the giving effect to the decisions of the courts when resisted by physical force, but however strongly this may refer to the political officers of the government, how can it apply to the judicial office?

"In the nature of his office, the President must superintend the executive department of the government. But the judiciary constitutes a co-ordinate branch of the government, over which the President has no superintendence, and can exercise no control. So far from this department being subject to the executive, it may be called to pass on the legality of his acts. The President, like all the other officers of the government, is subject to the law, and cannot violate it with impunity. He is responsible for the infraction of private rights, and before a territorial court, the same as before the other courts of the Union. In no just and proper sense can the President be required to see that the judicial power shall be carried out, except as controlling the physical power of the Union.

"The effects of the control of the judicial, by the executive power, are seen in the history of England, during the reign of the Stuarts. The most insupportable tyranny and corruption were realized under this paramount power of the executive government. It has always been the corrupting power of all free government. This, in a great degree, arises from the extent of its powers and patronage. and in the formation of our government, great care was taken to place the judicial power on an independent basis. Being without patronage, and discharging the most onerous and delicate duties, nothing but a high and an impartial discharge of its functions can sustain it.

"Whenever any portion of the judicial power shall become subject to the executive, there will be an end of its independence and purity. It will become the register of executive decrees and of a party policy. What could create a deeper degradation than to see any branch of the judiciary, which stands between the executive power and the rights of the citizen, become the mere instrument of that power. * * *

"This territorial judicial power was intended to be a check upon the executive power, and it would be inconsistent with the principles of our government for the judges to be subject to removal by the executive."

In Ekern v. McGovern, 154 Wis. 157, 142 N. W. 595, 46 L. R. A. (N. S.) 796, this view is expressed:

"The basic idea of the state Constitution is that this 'is a popular representative government, the officers being mere agents, not rulers of the people—one where no man is so high as to be above the Constitution and no one so low as to be beneath its protection'." Evans v. Foster, 1 N. H. 374; McDowell v. Van Dusen, 12 Johns. (N. Y.) 356.

Mr. White states:

"There is little doubt but that the Great Chief Justice Marshall would have been recalled, after his decision against the government, in the trial of Aaron Burr for treason, if the recall of judges by popular vote had then obtained in the United States."

There is less doubt that President Jefferson would have, by executive order, vacated the appointment of Chief Justice Marshall made by his predecessor, President Adams, had he supposed himself possessed of that power, for "the power of Jefferson's administration was used, unsparingly, to obtain Burr's conviction, and he was already convicted in the forum of public sentiment, for the populace believed him guilty." Marshall said: "It is to the last degree important that he (the judge) should be rendered perfectly and completely independent with nothing to control him but God and his conscience." And in so saying he merely reiterated Biblical law: "Ye shall not be afraid of the face of man, for the judgment is God's." (Deut. 1:17.)

It is to be noted how the recall of judges in Babylon and Greece weakened and destroyed their independence and made them subservient tools of the popular, and great leaders of the majority. It is observed: "That in time the respect of the community for judges so situated was completely destroyed and the fear of humiliation and disgrace prevented gentlemen of dignity and ability from seeking such a precarious place, and the whole judicial system was thereby perverted and deranged."

Mr. White says:

"Shall the illuminating precedents of history ever be forgotten; shall the landmarks of the fathers and the lighthouses, planted upon the shoals upon which other ships of state have floundered, be torn away? Are the secrets of the old doomsday books of the Anglo-Saxons to be read in vain and the mistakes of the law of ostracism of the Athenians and the discarded and condemned law of petalism of the Syracusans, to be adopted

in the United States, in the twentieth century?

"If the day shall ever come, in the United States, when this mistaken custom of the Babylonians and the ancient Athenians shall be generally established, and the disappointed suitor and political demagogue can gather his associates and bid the judge come down from his judgment seat to answer the excited multitude for the correctness of his judgments, then the safeguards of the Constitution, guaranteed to us by the patriot fathers will be trampled under foot; this will cease to be a government of law, and become a mere aggregation of people, where law is not the rule of life."

In regard to constitutional provisions such as provided in Oklahoma, we observe what has been said:

"The patriot fathers, profiting by the accumulated wisdom of the past, builded an edifice in this free land of ours, bo.tomed upon the solid foundation of constitutional principles, sufficiently enduring to withstand the most tempestuous seas of par.isan politics, because they profited by the record which history recorded of the stranded wrecks .of states upon the shores of time."

We hold that when an elective judicial office becomes vacant and the Governor fills the same by appointment, the officer appointed occupies precisely the same status as the officer in whose place and stead he was appointed. Ernest v. Canary, 139 Okla. 128, 281 Pac. 574.

In the case of Williams v. Benet (S. C.) 14 L. R. A. 825, it was held:

"When his honor, Judge Wallace, was commissioned by the Governor, under the provisions of section 6, art. 4, of the Cons.itution, to take the place of Mr. Justice McGowan, disqualified 'for the trial and determination' of this case, he thereby became pro hac vice an associate justice of the Supreme Court, and, as such, invested with all the powers incident to that office so far as the trial and determination of this case was concerned; and hence we are of the opinion that the Supreme Court, composed of the senior associate Justice and Judge Wallace, commissioned to preside in this case as above stated, constituted a legal and competent tribunal, fully authorized to render the judgment in question in this case."

33 C. J. 942, reads as follows:

"Where a judge has duly qualified as to selection, he is entitled to exercise the duties of his office during the period or term provided by law, until in one of the methods provided by law he becomes disqualified."

33 C. J. 971, reads:

"A person appointed to fill the vacancy in the office of a judge is usually endowed with the powers that belong to the occupant of the office. During the period of his incumbency, he is considered a judge de jure."

33 C. J. 1035, states:

"As to particular case or cause. If a special judge is selected for the purpose of hearing or presiding over a certain and specified case or cases, his jurisdiction is limited to the trial and determination of that particular case or cases. But the special judge, after he qualifies, possesses all the powers of the regular judge as to the case or cases for which he has been selected, until it or they have been finally determined, regardle.s of the disqualification of the regular judge, subject to revert to the control of the regular judge in the event that the special judge becomes incapacitated or refuses to act."

In support of this proposition the following cases are cited: Boone v. Boone (La.) 92 So. 861; Burrage v. St. (Miss.) 58 So. 217; Scott v. Joffee (Mo. App.) 102 S. W. 1038; Nebraska Mfg. Co. v. Maxon (Neb.) 36 N. W. 492; State v. Tomlinson (N. D.) 74 N. W. 995; Ford v. Simmons (Tex. Civ. App.) 171 S. W. 1077; Fisher v. Puget Sound Co. (Wash.) 76 Pac. 107; Speers v. Speers, 28 Ont. 188; Langrum v. Chamberlin, 73 Ga. 727; Glover v. Morris (Ga.) 50 S. E. 956; Sublett v. Gardner (Ky.) 137 S. W. 864; State v. Wear (Mo.) 31 S. W. 608; Matthews v. Superior Court (Cal.) 10 Pac. 128; Gainesville Buggy Co. v. Morros (Ga. App.) 98 S. E. 100; Mayer v. Haggerty, 138 Ind. 628, 38 N. E. 42; Hentig v. Thomas (Kan. App.) 53 Pac. 80; Comm. v. Carnes, 124 Ky. 340, 98 S. W. 1045.

So that when a regularly elected judge of the Criminal Court of Appeals certifies his disqualification as to particular cases, and a special judge is appointed to sit in consideration and final determination of such cases, such special judge occupies the same status as the regular judge. His term of office is thus fixed "for the trial and determination of such cases," and such special judge is subject to removal only by the procedure fixed by law for the removal of such regular judge.

The Supreme Court of West Virginia so held on May 20, 1919, in the case of Monongahela Valley Traction Co. v. Beard, 99 S. E. 452:

"The only grounds justifying the removal of a special judge, duly elected and sworn to try a particular case, are those which would disqualify a regular judge to preside in the cause.

"Where the people by the Constitution, and the Legislature by statute, have comprehensively dealt with the subject and prescribed

the grounds for removal and of disqualification of judicial officers, the courts are not justified in adding other grounds not comprehended therein or recognized by the common law."

In the case of Cantwell v. Owens, 14 Md. 215, it was said:

"We have no idea that the Convention designed to make any of the officers of the government, discharging judicial functions, dependent on the will of the executive. They derive their powers originally from the people. When provision is made for filling vacancies in another mode, it results from the necessity of the case, and is allowed for convenience; the question being remitted to the people at the earliest practicable time. In no case is the power of removal of such officers conferred on the Governor, except by the 30th Art. of the Bill of Rights, and the 4th and 9th secs. of art. 4, upon an address of the General Assembly. If the power exists in the present case, might it not be exercised with as much propriety in reference to the judges of courts and all other offices in which the Governor has power to fill vacancies For the appointment of a judge until the next election of delegates, is as much an appointment for a term of years as that of a justice of the peace until the next regular election of said officers. This would be the inevitable result of the argument, but for the clauses above referred to, which provide for the removal of judges. If it be conceded that the Constitution does not provide for the security of the citizen against incompetency and misconduct of this class of officers, it does not follow that the Governor possesses that power to remove them for such cause. His authority, under the 15th section of the 2nd article, applies to such officers as the executive has power to fill, by original appointment for terms of years, and it does not embrace justices of the peace.

"It would be contrary to the nature of our institutions, and effect the independence of the judiciary, if he had the power; as it is not conferred in terms by the Constitution, the exercise of it cannot be sanctioned by mere construction."

In the case of Kentucky Union Co. v. Bailey, Special Judge, 192 S. W. 708, decided by the Court of Appeals of Kentucky on March 9, 1917, it was held:

"Where the Governor designated a judge to act for a disqualified judge in another circuit pursuant to Kentucky St. 1915, sec. 971, he could not later designate another special judge to act in the same circuit during the same term.

"When a special judge has been selected and notified to hold a term of court, or to hold a court and try a case or cases, and has complied with the notification and appeared in the court and qualified, it is beyond the power of the Governor to revoke his appointment, or to supersede him by the appointment of another special judge for the same duties in whole or in part during the period in which he is authorized to act as such special judge.

"A contrary rule would injuriously affect the independence of the judiciary and the orderly administration of justice."

If the Governor possessed power to remove a Special Judge of the Criminal Court of Appeals by virtue of section 2, C. O. S. 1921, as contended, he would likewise have power to remove Justices of the Supreme Court appointed by him, either in the event of vacancies or disqualifications of the regular members should we all disqualify in this case, and should the Governor fill our places by appointment, if such were the law, he would be at liberty to remove them in the event he did not like the decision, and appoint a new court to consider rehearing, and thus completely control the action, conduct, and administration of judicial decisions. Such is not the law. Happily it is not the law, for such a situation would be tyrannous and utterly destructive of an independent judiciary.

It, therefore, follows that the act of the Governor in issuing the order of revocation and cancellation of the commission made, executed, and delivered to the respondent Rowe, under which he qualified and was serving, is without legal force and effect. Likewise the appointment of Honorable J. T. Dickerson was void, as no vacancy existed. When once Special Judge Rowe was regularly appointed and qualified, the Governor's power was exhausted, unless and until a vacancy in the office occurred in the manner provided by law.

33 C. J. 937, states the rule:

"When a Governor has exercised his constitutional power of appointment of a judge, and the appointee duly commissioned, the Governor's power is exhausted and he cannot recall the commission. * * *"

Authorities too numerous to cite support this text.

There is nothing to show that respondent Rowe has for any reason under the law become disqualified.

33 C. J. 942:

"The causes, enumerated in the Constitution or statute, for which a judge may be removed from office, are subject to strict construction, and there can be no removal except on the grounds therein enumerated."

We now apply the rule of strict construc-

tion to section 2, C. O. S. 1921, relied upon as a vesture of authority for removal in the Chief Executive of a judicial officer.

(a) The statute is general in its terms; it does not specifically vest authority in the Chief Executive to remove a judicial officer.

(b) The statute prescribes the causes for which the Governor has power to remove any officer appointed by him, whereas neither in the order of removal nor elsewhere is it shown that the purported removal was for any of the causes provided (incompetency, neglect of duty, malfeasance in office).

(c) Section 2, art. 8, Constitution, supra, establishes the policy of our basic law—it provides "all elective officers, not liable to impeachment, shall be subject to removal from office in such manner and for such causes as may be provided by law." While section 2, C. O. S. 1921, enumerates causes, it does not prescribe the manner of proceedings to establish the cause, nor the manner of removal, whereas the subsequent enactments providing grand jury procedure deal comprehensively with the subject by enumerating the causes and establishing procedure to determine the existence of the cause and specifying the manner of removal of "any officer not subject to impeachment elected or appointed" to office.

(d) Section 2, C. O. S. 1921, probably was intended originally (St. 1890, sec. 6553) to apply only to such offices as the Governor had power to fill originally by appointment, and was never intended to apply to such offices as were filled originally by the people in elections, and where subsequently by necessity (temporary disqualification of incumbent) the incumbent was replaced.

We have reviewed the decision of Bynum v. Strain, 95 Okla. 45, 218 Pac. 883, and find nothing therein contained contrary to the views herein expressed in reference to judicial officers. That cause concerned the removal of an executive officer, as most forcibly therein stated. That case considered whether the sufficiency or lack thereof of cause for removal presented a judicial question or the exercise of executive discretion, and held the latter.

We have read with much interest the cause of Myers v. U. S., 71 L. Ed. 160. In the first paragraph of that opinion the scope of the decision was limited to "power of removing executive officers of the United States" by the President under the provisions of the federal Constitution. The limitation of the decision to removal of executive officers by the chief executive authority is reiterated throughout the text, emphasized by the dissenting opinions therein, and thereafter restated by the Supreme Court of the United States in the case of Springer v. Government of the P. I., 277 U. S. 189, which subsequent decision appears to us to be a counterpart of the Myers Case, and in which it is emphasized that the separation of the tripartite division of governmental powers is basic and vital; that the principle is implicit that these powers shall be forever and distinct from each other.

A matter of some moment not presented by any of the parties to this action has been considered by this court upon its own initiative because of the public nature of the cause at bar. This matter is that neither the commission nor appointment of respondent Rowe, nor the appointment of Dickerson, heretofore set out, runs in the name of the state. Respondent's authority pleaded in his supplemental response reads as follows:

"The Governor of the State of Oklahoma.

"To All Who Shall See These Presents Greeting:

"Know Ye, That reposing special trust and confidence in the ability and integrity of Prentiss E. Rowe, Pawnee, Okla., I have appointed and do hereby commission him Special Judge of the Criminal Court of Appeals of the State of Oklahoma, for the Northern District, in cases A-7547 and A-7591, Sam Ingram v. State of Oklahoma. (Succeeding Judge Will H. Chappell, disqualified) said appointment to remain in full force and effect through and until the final determination of said cause in the Criminal Court of Appeals of the State of Oklahoma.

"And to authorize and empower him to execute and fulfill the duties of that office according to the Constitution and laws of the state of Oklahoma, and to have and to hold said office with all the powers, privileges, and emoluments thereto appertaining unto him, the said Prentiss E. Rowe, Pawnee, Oklahoma.

"In testimony whereof, I have caused the Secretary of State to attest this certificate and caused these letters to be made. Patent, and the Great Seal of the State of Oklahoma to be hereto affixed.

"Given under my hand at the city of Oklahoma City, the Seventh day of November in the Year of our Lord Nineteen Hundred and Thirty and of the Independence of the

United States of America the One Hundred and Fifty-sixth.

"By the Governor:
    "William J. Holloway.

        "William J. Holloway, Governor of
        "the State of Oklahoma.
"(Seal)
"Graves Leeper,

"Secretary of State of the State of Oklahoma.

"By: Una Lee Roberts,
    "Assistant Secretary of State."

Section 13, art. 1, Constitution, provides:

"The Governor shall commission all officers not otherwise commissioned by law. All commissions shall run in the name and by the authority of the 'State of Oklahoma,' be signed by the Governor, sealed with the Great Seal of the State of Oklahoma, and attested by the Secretary of State. When any office shall become vacant, he shall, unless otherwise provided by law, appoint a person to fill such vacancy, who shall continue in office until a successor shall have been duly elected or appointed, and qualified according to law."

If the filling pro tempore of the office of Judge of the Criminal Court of Appeals constitutes the commissioning of an officer not otherwise commissioned by law, and if there be no distinction between an appointment and a commission, then it would seem that the contenders for the office should have a commission running in the name of the state. See State ex rel. West, Atty. Gen., v. Breckinridge, 34 Okla. 649, 126 Pac. 806.

It would seem that the use of the two different words "commissions" and "appoint," contained in the constitutional provision, must have been for some purpose. The first sentence used in the constitutional provision also tends to show that it was contemplated that some officers would receive their authority "otherwise" and "by law."

There are two sections of the statute applicable to the method of filling such an office pro tempore. They are sections 3038 and 2632, O. O. S. 1921. The former provides that "when said court or any member thereof shall be disqualified under the Constitution and laws of this state, * * * the Governor shall immediately commission the requisite number of persons learned in the law for the trial and determination of such case or cases. (S. L. 1909, p. 170.) The latter section provides, in part: "Whenever any member of either of said courts is disqualified * * * the Governor of the state 'shall appoint

some member of the bar of the state, possessing the same qualifications as the members of such courts, to sit as special judge in said cause."

Considering these statutes in pari materia, together with the provision of section 13, art. 6, supra, it may with reason be said that "commission," as used in the Constitution, applies only to those offices originally or in the first instance filled by the commission of the Governor, for example, Board of Affairs, as distinguished from offices filled by elections, as, Attorney General, and to those filled only on occasion temporarily and by necessity of circumstances, as the one involved in the case at bar. We are not without doubt. Certainly state offices filled in the first instance by designation of the Governor should have an incumbent possessed of a commission running in the name of the state, and in order to remove the question beyond the realm of doubt, as applied to officers appointed pro tempore and as successors to elected officers, it might be well for them to have commissions or appointments, so running in the name of the state.

It is not necessary to decide this issue raised by this court for the reason that respondent Rowe is in possession of the office here considered. The law abhors a vacancy in office. In any event, respondent Rowe is a de facto officer and entitled to hold the office as against one subsequently designated, as was Honorable J. T. Dickerson.

Our judgment must be for the incumbent upon his authority before us.

HEFNER, CULLISON, SWINDALL, and ANDREWS, JJ., concur. KORNEGAY, J., dissenting. CLARK, V. O. J., not participating. McNEILL, J., not participating herein, having presided as trial judge in the causes of the State of Oklahoma v. Sam Ingram. LESTER, C. J., absent.

---

KORNEGAY, J. (dissenting). I cannot agree with the conclusion reached by a majority of the court, and I think the matter is of such vital importance that it warrants careful consideration by every member of the court, and that the placing of my view in a dissenting opinion is here justified.

The opinion, as I view it, deprives the supreme executive power of the state of the right to function in the manner permitted by the statutes and prescribed by the Con-

252

stitution of the state. As it seems to me, it runs counter to the opinions heretofore expressed by this court, as found collated under the applicable provisions of the Constitution, and the governing statutes, as embodied in the latest compilation, the Compiled Statutes of Oklahoma, 1921. It also runs counter to the decisions of the United States Supreme Court touching revocations by the President of judicial authority in those chosen to exercise it, under a Constitution less definite than that of Oklahoma.

The construction placed on the meaning of the statutes of the state, that on their face are plain and unambiguous, is not only strange, but startling. Comparisons with Greece and Babylon, and a dissertation upon the recall of judges, and a reference to intrigues of some of our English ancestors, and how we have striven to get away from such things, undoubtedly are matters that we should ever be mindful of. Perhaps a comparison of executive power exercised by the King of Siam, and also by the Sultan of Turkey, might help us in Oklahoma, but if while journeying from Siam to Turkey the author had stopped in faction-torn China and borrowed a copy of the Oklahoma Constitution we loaned them some years ago, and ascertained how its inhabitants construed it, more light would have been shed on the proper solution of the question involved, and the opinion thereby could have been made better.

Apparently, the opinion holds that the executive, in making and revoking appointments, is governed by different rules, depending on the kind of function the appointee is to discharge. Apparently, also, the second section of the syllabus indicates that the powers vested in the one who for the time being is Governor vary with a change of personnel.

The fifth section of the syllabus holds that a section of the statutes giving the Governor "power to remove any officers appointed by him" is not applicable to a temporary appointment to an office judicial in nature, but applies to all other kinds, thereby reading into an act of the Legislature an exception or proviso, though there was none when in 1913 the Revised Statutes were enacted, after two codifications, one by the majority, and one by the minority, of the Code Commissioners. Of course, the same consideration should be had and the same principles applied by the court in reviewing the action of the appointing power that apply to statutes, i. e., that there should be no doubt as to the unconstitutionality of the act of the

Executive, acting under constitutional provisions, before this court would find itself warranted in declaring an act of the Governor of the state unconstitutional. Without these matters being taken into account, immediately judicial decisions themselves are liable to become unconstitutional. It then becomes an arbitrary substitution by the court of its views of public policy for the discretion reposed by the Constitution in the Executive, in whom the appointing power is by the Constitution lodged. For its abuse, the Executive is responsible to the people, rather than to this court.

In my view, the provisions of that branch of the Constitution cited concerning the division of governmental power are strictly applicable here, but they do not appear controlling. In the first article and first chapter, as found in the Compiled Oklahoma Statutes of 1921, at page 307, by reason of the provision in the Enabling Act, there is conferred upon the Governor the power to remove any officer originally appointed by him, when not made to fill a vacancy, and clearly, under the decisions, he alone passes upon the fitness of his appointee to continue, and it is practically conceded everywhere that the courts cannot constitutionally interfere with his discretion.

This decision reads into an act of the Legislature some things that are not in it. It makes an exception where there was none. It sets aside and holds for naught the action of the Chief Executive in revoking an appointment, made by the Executive, in a matter entrusted to him by the Constitution and by the legislative act, which act had been subjected to the scrutiny of trained codifiers and approved by a former Governor.

Under section 1, art. 4, forbidding the judicial department from exercising the powers properly belonging to the executive and legislative branches, it seems to me that the decision, as promulgated by the majority, is clearly violative of the letter and spirit of the cited article of the Constitution, as the inhibition works upon the judicial as well as the other branches of government. However, there is found in the majority opinion [page 247, 300 Pac. 733], after discussion of the impulses of Jefferson, the politician, and Marshall, the jurist, the following:

"Marshall said: 'It is to the last degree important that he (the judge) should be rendered perfectly and completely independent with nothing to control him but God and his conscience.' And in so saying he merely reiterated Biblical law: 'Ye shall not be

afraid of the face of man, for the judgment is God's.' (Deut. 1:17)."

Perhaps had the 16th and all of the 17th paragraphs of First Deuteronomy been set out, the quotation would have here more aptly applied. However, the great mistake of a late emperor, commonly known as the "Kaizer," was that he too used only a portion of the verses, and thought that his judgment was God's judgment, and that they were in partnership, and the man was the managing partner. This was ruinous, as we all now can see.

Perhaps the admonitions contained in the 11th paragraph of the 4th Epistle of James might not be amiss in this connection:

"1. Speak not evil one of another, brethren. He that speaketh evil of his brother, and judgeth his brother, speaketh evil of the law, and judgeth the law; but if thou judge the law, thou art not a doer of the law, but a judge."

And also the Saviour's precept to his disciples:

"Render therefore unto Caesar the things which are Caesar's, and unto God, the things that are God's."

The majority opinion quotes largely from Corpus Juris. That authority, properly looked into and examined closely with proper research, is a very safe guide, but must be used cautiously as the foundation of an opinion on the constitutional question and statutes involved here. The grave danger is that the opinion is likely to be filled with an enlargement of "Corpus," at the expense of "Juris."

The decision of the majority in this case has a great many elements, however, of "sui-juris" and "sui-geneuis". If one will examine our Constitution, and also our decisions, and analyze them in the light shed by an ordinary dictionary, and the decisions of the Supreme Court of the United States, some of which are referred to in the opinion expressing the majority view, the "fogs will vanish" and the "sunlight will appear," and the solution of the problem here involved would not be difficult or hazardous. Extracts from briefs, however, are dangerous. Several cases from other states are collated, but they do not appear to be controlling on the question here involved—many do not refer. The facts of the case must always be borne in mind, also their application. The filling of a vacancy in the office of judge is one thing, and the appointment of a temporary officer is another thing. The method of the filling of the vacancy is such as may be pre-

scribed by law. Its effect is also such as the law prescribes.

Evidently the majority do not recognize that in the present case there are two offices, each held by different parties, and selected in different ways. Judge Chappell's place is not vacant; he is still a Judge of the Criminal Court of Appeals, duly elected and qualified. If he should die, resign, or be removed, there would be a vacancy, and as soon as it was filled by the Governor, his power to further interfere would end. However, the office about which Judge Rowe and Judge Dickerson are contending is different. That office is appointive, and arises by operation of law as a result of Judge Chappell's disqualification to act in the special instance, the Governor being empowered by statute to name the incumbent, and also being allowed by statute to remove him, thus avoiding any question of power to remove being implied, arising from power to fill, as prescribed by the statute, in force by constitutional mandate. As well might we argue that the office of sheriff and deputy sheriff are the same, as to argue that Judge Rowe's desired office is the same as that of Judge Chappell.

The suggested question made on page 240 [300 Pac. 735] of the opinion, about the Governor's power to interfere with a successor of a judge of this court, by removing him if his decisions were not satisfactory, is scarcely worthy of consideration as an argument in support of the proposition taken.

An inspection of the typewritten opinion of the majority in this case shows a citation of certain authorities, and a statement of certain acts of the Legislature, as found in the present digest known as the compilation of 1921. The provisions of the Constitution are cited on the subject of the removal of officers, but it will be observed that they are elective officers, that are spoken of in the Constitution; at least, the quotations that were set forth clearly are confined to officers that are elective.

In the body of the opinion, the court quotes section 6, art. 8, that is a part of the impeachment provision of the Constitution, to the effect that the Legislature should pass laws for the purpose of carrying out the provisions of article 8, which appears to be the only place where the removal of officers is referred to in a general way. However, in the black letter type, accompanying the section, the compiler has added the words, "Legislature may pass additional laws." At page 243 [300 Pac. 729] of the opinion, there is a statement that the Legislature had

obeyed the constitutional mandate by enacting sections 2394 to 2425 of the Compiled Statutes. The slightest inspection, however, of the article on the subject of the removal of officers contained in the Compiled Statutes would have shown that the following annotation was at the bottom:

"History. RL 5592, Dak. 1387; S. 1890, 3827, as am. by 1895, p. 96."

By referring to the Revised Laws of 1910, section 5592, the actors in this case could have found a history of these statutes on the subject of removal of officers, and they would have found that these statutes practically all go back to 1890, with some slight amendments, one of which, 5608 in the R. L., 2410 in the Compiled Statutes, was inserted by the codifiers. By an inspection of the Compiled Oklahoma Statutes of 1921, they would have discovered that this court had held in the case of State v. Davenport, 79 Okla. 297, 193 Pac. 419, that the remaining portion of the sections cited was a special act and was cumulative, being enacted in the year 1917, and the first section being 2411, C. O. S. 1921, and is as follows:

"2411. Officers subject to removal. All state officers not subject to impeachment under section 1, article 8, of the Constitution, and all county, city and municipal officers may, in addition to the methods now and causes provided by law, be removed from office as herein provided."

The other portions of the chapter referred to and commented on as a foundation for holding in this case that the Governor could not remove Mr. Rowe, could scarcely be said to have been enacted by the Legislature in obeying the constitutional mandate, for the reason that the Compiled Statutes themselves indicate that they came over from Dakota, and were a part of the statute of 1890, several years before the birth of Oklahoma, though amended by the Territorial Legislature before the Constitution was made.

A further investigation would have shown that these statutes were in force in Oklahoma at the time the Constitutional Convention met, and were carried over as a part of the statutory law of the state of Oklahoma by virtue of the terms of the Enabling Act, and as prescribed by section 2 of the Schedule to the Constitution.

An investigation would have shown that the provisions, now run into C. O. S. 1921, as being the second section of the first article, as follows:

"2. May remove officers appointed. The Governor shall have power to remove any officers appointed by him, in case of incompetency, neglect of duty, or malfeasance in office; and may then fill the same as provided in cases of vacancy"

—came over in the same manner, and that both sections were in force when the case of Cameron v. Parker, 2 Okla. 277, 38 Pac. 14, was decided, cited at section 2, art. 5, of the Constitution, in both the R. L. 1910, and C. O. S. 1921.

It will therefore be seen that both of these statutes were before the members who framed the Constitution of the state of Oklahoma, together with their judicial construction, and were permitted to stand by them without change, though both were probably re-enacted by the Legislature in the year 1913, wherein Revised Laws were adopted. The Schedule put both in operation. If they had decided to change those provisions of the statute, they certainly would have done so, but instead of that, they did provide for impeachment of certain elective officers, though they made it imperative on the Legislature to pass laws on the subject, which was probably done by the Legislature in 1915, article 2, C. O. S. 1921, p. 346.

The argument that could legitimately be made from this review undoubtedly is that the Constitution makers intended to let the ordinary rules apply and permit the appointing power to be a revoking power. In the present case, the appointing power is the Governor, and nothing whatever is said limiting his power to revoke. The schedule in the Constitution put in force the statute conferring on the Governor the power to appoint and to remove all appointive officers, selected by him. Under these conditions, it was the duty of the Governor to remove Mr. Rowe, and appoint some one else, whenever in his judgment the interest of the state so required.

The Legislature saw fit to provide for a codification of the laws of this state, and a re-enactment of them in what is known as the Revised Laws of 1910. A history of the Oklahoma statutes can be found in the front of volume 1, and the majority of the court probably would not again make the same error if they would read the foreword of that edition, as well as the revisor's notes and the act appointing the Code Commission, and the act adopting the Revised Laws of Oklahoma, and the act providing for annotating, indexing, and publishing the Revised Laws of Oklahoma. After doing this, and appreciating its effect, and turning to the provisions of the Constitution of the state of Oklahoma, as published in the Revised Laws

of Oklahoma, they would have found that section 8 of article 6 commanded the Governor to cause the laws of the state to be faithfully executed, and the decision of Cameron v. Parker, 2 Okla. 277, was there cited on the subject of appointment and removal.

Under the head of section 2, art. 6, vesting the supreme executive power, the court would have found an annotation in black letter type, as follows:

"Official acts of Governor cannot be interfered with, nor controlled. State v. Huston, 27 Okla. 606, 113 Pac. 190."

They would also have found:

"Removal of appointee—Governor has right to hear and determine evidence against official, pass upon it and remove him from office, where statute confers power of removal upon him. This is not a judicial power. Cameron v. Parker, 2 Okla. 277, 38 Pac. 14. Courts may not review proceedings before Governor, so long as he acts within limits of power conferred upon him. He is exclusive judge of sufficiency of charges. Id. Removal of appointee of Governor. Power of Governor under territorial laws construed. Id. Same—power of removal exists in absence of statute. Id. Same—court will only inquire into facts sufficiently to determine if law has been observed. Id."

By searching the general index, under the head of "Governor," the court would have found at page 2394, the following:

"Removal of appointive officers, 8052."

By reference to that section, one would find that it reads as follows:

"8052. May remove officers appointed. The Governor shall have power to remove any officers appointed by him, in case of incompetency, neglect of duty, or malfeasance in office; and may then fill the same as provided in cases of vacancy."

So that, as applied to that statute, we can say that it was not only brought over by the Enabling Act, but also by the Constitution makers themselves, as they saw fit to provide how elective officers could be removed, thereby leaving the above section in full force and vigor, which was later re-enacted by the Legislature in adopting a revision.

Nowhere, so far, does there appear in the acts or contemporaneous constructions anything whatever to require the decision of the majority in this case. The contrary is shown in practically everything. Section 13 of article 6 specially commits to the Governor the authority to fill vacancies, and to commission all officers. Section 45, art. 5, confers power upon the Legislature, and requires it

to pass all necessary laws to carry into force the constitutional provisions. It is made the duty of the Governor by statute, in case of a disqualification of a member of the Criminal Court of Appeals, to appoint someone else, having the proper qualifications, to act in his stead. See Childs v. State, 4 Okla. Cr. 474, 113 Pac. 545. The functions of the regular judge are merely suspended by the disqualification in the particular instance, but it is not a case of filling a vacancy. The judge still survives. A deputy is merely named by the Governor.

In the present case, the Governor was empowered to appoint, and under the decisions that are cited in the respective places, describing that power, it is clearly held that the power to appoint carries with it the power to revoke. As applied to this case, it matters not whether the outgoing executive or the incoming executive appointed in the first instance. The power of appointment inheres in the office, not in the individual holding it, though through the medium of that individual, the appointment may be made. The power of revocation inheres in the same office, in the absence of a constitutional provision forbidding.

Where the supreme executive authority is conferred upon the Governor, as in our Constitution, and the further provision is made that he shall cause the laws to be faithfully executed, a question might arise as to whether or not the Legislature itself could prevent the appointing power from revoking by inserting a special forbidding provision, under a Constitution and statute worded like ours. That, however, is not this case. In this case the legislative authority has specially declared that the appointing authority can revoke. Such declaration was before the Legislature at the time it passed the law empowering the Governor to appoint a temporary officer to fill the place of a disqualified judge. If the Legislature had desired to limit that power, it would have been compelled to have said so, according to all rules of interpretation.

The reasoning of the court in this case does not seem to run on symmetrical lines, either logical, grammatical, or rational. At page 243 [300 Pac. 730] of the opinion, can be found the following example of the line of reasoning:

"Section 1, art. 4, Constitution of Oklahoma, reads as follows:

" 'The powers of the government of the state of Oklahoma shall be divided into three separate departments: the legislative, execu-

tive, and judicial; and except as provided in this Constitution, the legislative, executive, 'and judicial departments of government shall be separate and distinct, and neither shall exercise the power properly belonging to either of the others.'

"It is urged that section 2, C. O. S. 1921, be considered in pari materia with the provisions of section 2394, 2425, C. O. S. 1921. This we cannot do for we must consider the constitutional provisions under which the statutes exist. These constitutional provisions are sections 2 and 6 of article 8, and section 1 of article 4, supra. So considering the constitutional provisions, we find a lack of harmony when section 2 is considered in pari materia with sections 2394, 2425, supra. Conversely, when we consider sections 2394 to 2425, supra, as exclusive in remedy for the removal of a judicial officer nonimpeachable, and section 2, C. O. S. 1921, as applicable to executive officers only, the whole scheme of removal is workable and without incongruity, and without constitutional infraction.

"In the case of City of Ardmore v. Sayer, 54 Okla. 779, 154 Pac. 356, this court held:

" 'The question now presented is whether the power or authority of the mayor to appoint, carries with it the power of removal. Such seems to be the general rule adopted in this state, unless prohibited by statute.'

"Therein it was held that the power to remove was prohibited by provisions of the charter.

"Herein we hold the power to remove is prohibited by provisions of the Constitution. Cameron v. Parker, 2 Okla. 277, 38 Pac. 14.

"It is not to be understood that we hold the exercise of power to remove from office is necessarily a judicial matter. It is not so generally considered in this country. There are some authorities that hold a hearing to determine cause for removal is a judicial matter, but those authorities proceed upon the theory that there is a property right in the office—that it is a hereditament."

At page 244 [300 Pac. 730], we find the following:

"The Cameron Case holds:

" 'No one has a right of property in an office such as would bar the executive from removing him if cause presented where the statute confers that power, or even without a statute, an executive officer may exercise the power of removal, **unless expressly prohibited**, for the power of appointment, under the law, carries with it the power of removal.'

"Withal the power to remove a judicial officer may be, as in this case, an exercise of the function of the judicial department of government inhibited by section 1, art. 4, of the Constitution, supra. Witness the fact that the special judge last purported to be appointed voted to grant a rehearing and to stay the mandate in the Ingram case—saying at the time that he was not informed as to the merits of that controversy. We do not hold it to be true, but it is possible for an executive to direct a vote of one appointed by him, and it is possible that an executive could, if he possessed the power, recall a judge in the event he thought the judge's vote or action in error, and thus continue ad infinitum until he controlled the decision."

Beginning about the middle of page 244 [300 Pac. 730], and running to page 246 [300 Pac. 732], is an argument drawn from a great many sources, and made up of several component parts that probably might be described as an animated animadversion, interspersed with reference to judicial expressions, and among others, that of Mr. Justice Brandeis, in the 272 U. S. 107, 71 L. Ed., 160. At this stage of the argument, the case of United States v. Guthrie, decided in 1854, and the remarks of Mr. Justice McClain therein, together with a contrast between Jefferson and Marshall, and the recall of judges in Babylon and Greece, and a side journey to Siam and Turkey, with a reference to Ernest v. Canary, 139 Okla. 128, 281 Pac. 574, holding that when the parties agreed upon a judge pro tempore, he was a judge until he got through, is the matter covered by the argument, and the deduction is made at page 248 [300 Pac. 734] as follows:

"So that when a regularly elected judge of the Criminal Court of Appeals certifies his disqualification as to particular cases, and a special judge is appointed to sit in consideration and final determination of such cases, such special judge occupies the same status as the regular judge. His term of office is thus fixed 'for the trial and determination of such cases,' and such special judge is subject to removal only by the procedure fixed by law for the removal of such regular judge."

Again, at page 249 [300 Pac. 735], we find the following:

"If the Governor possessed power to remove a special judge of the Criminal Court of Appeals by virtue of section 2, C. O. S. 1921, as contended, he would likewise have power to remove Justices of the Supreme Court appointed by him, either in the event of vacancies or disqualifications of the regular members, should we all disqualify in this case, and should the Governor fill our places by appointment, if such were the law, he would be at liberty to remove them in the event he did not like the decision, and appoint a new court to consider rehearing, and thus completely control the action, conduct,

and administration of judicial decisions. Such is not the law. Happily it is not the law, for such a situation would be tyrannous and utterly destructive of an independent judiciary.

"It, therefore, follows that the act of the Governor in issuing the order of revocation and cancellation of the Commission made, executed and delivered to the respondent, Rowe, under which he qualified and was serving, is without legal force and effect. Likewise, the appointment of Honorable J. T. Dickerson was void, as no vacancy existed. When once Special Judge Rowe was regularly appointed and qualified, the Governor's power was exhausted unless and until a vacancy in the office occurred in the manner provided by law."

Again the opinion says:

"We now apply the rule of strict construction to section 2, C. O. S. 1921, relied upon as a vesture of authority for removal in the Chief Executive of a judicial officer.

"(a) The statute is general in its terms. It does not specifically vest authority in the Chief Executive to remove a judicial officer.

"(b) The statute prescribes the causes for which the Governor has power to remove any officer appointed by him, whereas neither in the order of removal nor elsewhere is it shown that the purported removal was for any of the causes provided (incompetency, neglect of duty, malfeasance in office).

"(c) Section 2, art. 8, Constitution, supra, establishes the policy of our basic law—it provides 'all elective officers, not liable to impeachment, shall be subject to removal from office in such manner and for such causes as may be provided by law.' While section 2, C. O. S. 1921, enumerates causes, it does not prescribe the manner of proceedings to establish the cause, nor the manner of removal, whereas the subsequent enactments providing grand jury procedure deal comprehensively with the subject by enumerating the causes and establishing procedure to determine the existence of the cause and specifying the manner of removal, of 'any officer not subject to impeachment elected or appointed' to office.

"(d) Section 2, C. O. S. 1921, probably was intended originally (1890—sec. 6553) to apply only to such offices as the Governor has power to fill originally by appointment, and was never intended to apply to such offices as were filled originally by the people in elections, and where subsequently by necessity (temporary disqualification of incumbent) the incumbent was replaced.

"We have reviewed the decision of Bynum v. Strain, 95 Okla. 45, 218 Pac. 883, and find nothing therein contained contrary to the views herein expressed in reference to judicial officers. That cause concerned the removal of an executive officer as most forcibly therein stated. That case considered whether the sufficiency or lack thereof of cause for removal presented a judicial question or the exercise of executive discretion and held the latter.

"We have read with much interest the cause of Myers v. U. S., 71 L. Ed. 160. In the first paragraph of that opinion the scope of the decision was limited to 'power of removing executive officers of the United States' by the President under the provisions of the federal Constitution. The limitation of the decision to removal of executive officers by the chief executive authority is reiterated throughout the text, emphasized by the dissenting opinions therein, and thereafter restated by the Supreme Court of the United States in the case of Springer v. Government of the P. I., 227 U. S. 189, which subsequent decision appears to us to be a counterpart of the Myers Case, and in which it is emphasized that the separation of the tripartite division of governmental powers is basic and vital; that the principle is implicit that these powers shall be forever and distinct from each other."

At page 250 and page 251 [300 Pac. 736] there is a discussion upon the proposition of one of the parties having a commission issued by Governor Holloway, and the other being removed by executive order. However, very little importance seems to be attached to these provisions by the author of the opinion, and it is not thought by the writer that it was at all vital to the decision, as the commission of Judge Rowe does not run in the name of the state of Oklahoma as prescribed by section 13, art. 6, of the Constitution, set out under it, if here applicable. The writer is not advised as to whether or not the orders designating special judges have heretofore been in form in the name of the state, but his information is that they have not, but the practice largely has been by simple executive order.

At page 243 [300 Pac. 730] of the opinion, the following is found:

"It is our opinion that section 2, last quoted, is not applicable for the removal of the respondent for the reason that the appointment herein sought to be vacated was a judicial appointment. There is no case presented and we know of none where under a constitutional provision such as contained in section 1, art. 4, infra, it has been held that an executive could, by reason of a statute, or independent of statute, recall an appointment to office in an independent branch of government; whereas, on the other hand, there are many cases to the contrary, some of which are hereinafter cited."

The Constitution of the United States is not as explicit as ours is in conferring su-

preme executive authority upon the President. That Constitution prescribes that certain officers shall be named by the President, with the consent and advice of the Senate, and judicial positions have been created since by acts of Congress, wherein judges have been appointed and terms fixed, by and with the advice and consent of the Senate, who have been removed by the Executive without being compelled to account to anybody for that action.

Had the author of the majority opinion searched a little further, and especially the dissenting opinion of Justice Brandeis, 71 L. Ed. 218, from which a quotation is found on page 245 [300 Pac. 731], he would have found a reference to the case of McAlister v. U. S. 141 U. S. 174, 35 L. Ed. 693, which was a case wherein President Cleveland, by executive order, probably a letter, removed Mr. McAl'ster from a judgeship, and Mr. W. H. Taft, later the Chief Justice of the Supreme Court of the United States, was counsel for the United States, and the opinion was rendered by Mr. Justice Harlan, affirming the action of President Cleveland. At that time, there were statutes prescribing what the President could do, and what the President could not do about removals, and the course of legislation was reviewed, and notwithstanding the word "courts" was used in the prohibitory legislation, the Supreme Court of the United States held that the power of the Executive to dismiss Mr. McAlister from service was complete.

Some dissenting opinions were filed, among others that of Mr. Justice Fields. In that he refers to the case of U. S. v. Guthrie, so strenuously quoted from here, and also the case of U. S. v. Fisher, 109 U. S. 143, and he specially says that the case went off on other grounds.

It has not been thought by the writer that in this case more was necessary than to turn to our own Constitution and our own statutes. on the subject, and to take the annotation of each one and run the cases in order to reach a correct conclusion. This view, however, does not appeal to the majority in this case.

By referring to the statute of 1921, inferentially one can get the history of these acts, and under section 8 of article 6, we find an annotation, put there by somebody, with reference to the removal of an appointee, and that is as follows:

"Removal of appointee. Duty of Governor to see that laws are faithfully executed, and in removing an officer, the Governor acts under his official oath to support, protect, and defend the Constitution and laws, and is responsible to the people for the faithful execution of his high office, and whether wisely or unwisely administered, the source of such responsibility is the same. Cameron v. Parker, 2 Okla. 277."

Under section 2 of the same article, we find also the annotation which is quoted above. We also find the section 2 of art. 1 of the compilation of 1921, heretofore referred to, as being in full force and vigor.

However, if we turn to those things that the members of the Constitutional Convention were familiar with, viz., the federal and territorial Supreme Court decisions, we will find that it has never been questioned until now in this jurisdiction that where an officer was appointed, as this man was, the appointive power could not revoke. It appears to the writer that this decision is a clear misinterpretation, by the majority, of plain statutes and a plain Constitution.

The Myers Case, that has been referred to in the majority opinion, can be found in the 71 L. Ed. 160, and while it was rendered after the Constitution of Oklahoma was made, and was decided by a divided court, Mr. Chief Justice Taft delivering the opinion, and Mr. Justice Holmes, Mr. Justice McReynolds, and Mr. Justice Brandeis delivering dissenting opinions, scarcely can there be found an expression in either of the original opinions that would warrant this court in disregarding the plain words of our Constitution, or to claim that because our Constitution divides the administration of affairs in this state into three divisions, under the guise of judicial decision the appointive power of this state can be controlled, much less that this court would disregard a plain legislative provision, far older than the court itself.

Referring to the dissenting opinion of Mr. Justice McReynolds, it will be seen that he nowhere claims that when the Constitution has prescribed that power exist in the Executive, any exception should be made by the Legislature. At page 183, he says:

"Constitutional provisions should be interpreted with the expectation that Congress will discharge its duties no less faithfully than the Executive will attend to his. The Legislature is charged with the duty of making laws for orderly administration obligatory upon all. It possesses supreme power over national affairs and may wreck as well as speed them. It holds the purse; every branch of the government functions under statutes which embody its will; it may impeach and expel all civil officers. The duty is upon it 'to make all laws which shall be

necessary and proper for carrying into execu.ion' all powers of the federal government. We have no such thing as three totally distinct and independent departments; the others must look to the legislaive for direction and support. 'In republican government, the legislative authority necessarily predominates.' The Federalist, XLVI., XLVII. Perhaps the chief duty of the President is to carry into effect the will of Congress through such instrumentalities as it has chosen to provide. Arguments, therefore, upon the assumption that Congress may willfully impede executive action are not important."

At page 224, he refers to the McAlester Case in the following language:

"McAlester v. U. S. (1891) 141 U. S. 174, 35 L. Ed. 693, 11 Sup. Ct. Rep. 949. Plaintiff was appointed district judge for Alaska 'for the term of four years from the day of the date hereof, and until his successor shall be appointed and qualified, subject to the conditions prescribed by law.' He was suspended and the Senate confirmed his successor. He sought to recover salary for the time between his removal and qualification of his successor. Section 1768, Rev. Stat., authorized the President to suspend civil officers 'except judges of the courts of the United States.' This court reviewed the authorities and pointed out that judges of territorial courts were not judges of courts of the United States within sec. 1768, and, accordingly, were subject to suspension by the President as therein provided. This argument would have been wholly unnecessary if the theory now advanced, that the President has illimitable power to remove, had been approved."

The headnotes in Cameron v. Parker, 2 Okla. 277, 38 Pac. 14, are as follows:

"1. Mandamus — Office, Title to — Mandamus will not lie to try the title to a public office. (Ewing v. Turner, 2 Okla. 94, 35 Pac. 951).

"2. Same—It may be stated as a general rule, in an action in mandamus, that, where a relator shows a prima facie title to a public office, he is entitled to the aid of mandamus to obtain possession of the books, records, insignia, paraphernalia, and official belongings of such office; and in granting the writ, the court will not go behind such showing, and try the title thereto. (Ewing v. Turner, supra.)

"3. Governor—Officer Removed by—Courts Have no Power to Review His Actions—So long as the Governor's action in removing an officer is within the limits of the power conferred upon him by statute, the courts cannot interfere to arrest his action or review

the proceedings before him. He is the exclusive judge, so far as the courts are concerned, of the sufficiency of the proof of the charges, and his findings are not reviewable by any court.

"4. Constitution—That clause of the Bill of Rights, that 'no person shall be deprived of life, liberty or property, without due process of law', is not infringed by a statute giving the Governor power to remove a Superintendent of Public Instruction from office for incompetency, neglect of duty, or malfeasance in office, without a trial in a court of law, there being no such thing as title or property in a public office, within the meaning of that section.

"5. Public Officer—Removal of—The power conferred on the Governor of the territory by par. 5976, Statutes of 1893, is administrative and not judicial, and, therefore, not in conflict with par. 9 of the Organic Act conferring judicial power on the courts of the territory.

"6. Appointment—Removal of Officer—No one has a right of property in an office such as would bar the executive from removing him, if cause presented, where the statute confers that power, or even without a statute, an executive officer may exercise the power of removal, unless expressly prohibited, for the power of appointment, under the law, carries with it the power of removal under the law."

The reasons for the action of the parties concerned in this litigation are not disclosed, but under the law, the executive authority, as I view it, in this case, was within its rights in revoking the appointment of the respondent, and I cannot believe that the opinion of the majority, holding it void, is warranted by the statutory law or the Constitution.

As applied to the statutes here, this court has, in effect, repealed a statute that has been in existence practically during all of Oklahoma's history, and repudiated a general doctrine that has been acquiesced in for years. It has repudiated its own decisions. This decision says to the future Executive that no mistake made by him in appointing a special judge can by him be corrected. It will be used as a support for the hands of a designing Executive and to tie the hands of a conscientious one. It will lead to destruction. I think the decision clearly in violation of the Constitution, and sets at naught worthy precedents.

I, therefore, cannot agree with the views expressed in the majority opinion, and register this dissent.