JONES v. FREEMAN et al.

No. 31322. Oct. 12, 1943.

Rehearing Denied Feb. 8, 1944.

*146 P. 2d 564.*

Samuel A. Boorstin, of Tulsa, for petitioner.

Mac Q. Williamson, Atty. Gen., and Randell S. Cobb, First Asst. Atty. Gen., for respondents Shaw, Childers, Cheatham, Coogan, and Cordell in their official capacities.

Streeter Speakman, of Sapulpa, John Steele Batson, of Marietta, Tom Kight, of Claremore, and Purman Wilson, of Purcell, for respondent Harold Freeman.

HURST, J. This is an original action brought by petitioner, Jenkin Lloyd Jones, to test the validity of the various legislative apportionment acts enacted since the adoption of the Constitution.

Petitioner alleges all of such acts to be contrary to express constitutional provisions, and seeks (unless a valid law be enacted meanwhile) to require the next election to be held under the ap-·apportionment as made by the Constitution, as well as to restrain the payment of compensation to legislators already elected under the allegedly invalid laws.

It has been stipulated that petitioner is an elector and taxpayer of Tulsa county, and that he has voted in elections held under the challenged statutes. We will take judicial notice of the population of the counties of the state as shown by each decennial federal census. 18 Am. Jur. 200.

By article 5, sec. 11, of the Constitution the state was divided into 33 senatorial districts, 22 of them being given one Senator each and 11 being given two Senators each. By article 5, secs. 12-16 of the Constitution, 109 representatives were apportioned among the 75 counties created by the Constitution, each county being given at least one representative. (Two counties, Harmon and Cotton, have been created since the Constitution was adopted.) However, the framers of the Constitution intended that the legislative apportionment contained therein should serve only until 1911. They made it the duty of the Legislature at that time to enact a new apportionment law, based upon the population as ascertained by the federal census of 1910, or in such other manner as the Legislature might direct (no other method. of ascertaining population has been provided),' and they also made it the duty of future Legislatures to enact apportionment laws after the taking of each succeeding decennial federal census. Const. art. 5, secs. 9, 10, and 11. In passing apportionment acts the principle of equality is, as a general rule, enjoined upon the Legislature, so that each voter of the state will have approximately the same power and influence in electing members of the two houses of the Legislature, and in shaping legislation, as every other

voter. Thus article 5, sec. 9 (a), of the Constitution provides that at the time of each senatorial apportionment after the year 1910, the state shall be divided into 44 senatorial districts, each of which shall elect one Senator and shall "contain as near as may be an equal number of inhabitants." It further provides that the Senate shall always be composed of 44 Senators, except that such members may be increased to the extent that single counties are entitled to more than two Senators. Article 5, sec. 9 (b), provides that districts in counties entitled to two or more Senators shall be so arranged "as to make such districts most nearly equal in number of inhabitants" consistent with the duty not to divide towns or city wards constituting only one voting precinct.

Substantial equality in apportioning the members of the House of Representatives among the counties of the state was enjoined upon the Legislature by article 5, sec. 10, of the Constitution, except that it was provided that no county should "take part in the election of more than seven representatives," and that any county having a population equal to one-half a ratio should be entitled to one representative.

The ratio for the House of Representatives is obtained by dividing the whole population of the state by 100. Section 10 (c). If a county has less than one-half a ratio, it *must* be attached to an adjoining county. The formula for equalizing the representation in the House of Representatives throughout the ten-year period is set out in article 5, secs. 10 (d) and (e), of the Constitution. While the principle of equality is the rule, exceptions are made in favor of the less populous counties that have as much as half a ratio but not a full ratio and against the populous counties having over seven ratios. Thus under the 1940 federal census, Oklahoma has a population of 2,336,434, making a ratio for the House of Representatives 23,364, and Major county, with a population of 11,946, is alone entitled to one representative, un-

less an adjoining county is attached to it as authorized by article 5, sec. 10 (g), while Oklahoma county with a population of 244,159 is entitled to but seven representatives, or one for every 34,879 of the population of the county. So, in this instance, the Constitution gives each voter in Major county approximately three times as much influence on legislation passed by the House of Representatives as is given each voter in Oklahoma county. But this is an exceptional case, and is possible only because the Constitution makes it so.

In 1911, 1921, 1931, and 1941, the Legislature enacted statutes apportioning representation in the House of Representatives (S. L. 1910-11, p. 266; S. L. 1921, p. 69; S. L. 1931, p. 9; S. L. 1941, p. 39)., but no general apportionment statute affecting the Senate has been enacted since statehood. While several acts altering or creating individual senatorial districts have been passed, the majority of senatorial districts created by the Constitution remain unaltered, and at present 34 of the 44 members of the Senate are elected from such districts. As a result, because of the growth of cities and a shift of population since 1907, the representation of many counties in the Senate, upon a basis of population, is now grossly disproportionate to that of other counties. The following table of the six least populous and the six most populous senatorial districts as they now exist, with the population of each according to the federal census of 1910 and 1940, will serve to illustrate the changes which have taken place and the condition that now exists:

SIX SMALLLEST DISTRICTS:

| Dist. No. | Counties | 1910 | 1940 |
|---|---|---|---|
| 26 | Marshall, Love | 28,353 | 23,817 |
| 4 | Greer, Harmon | 27,777 | 24,569 |
| 12 | Logan | 31,740 | 25,245 |
| 7 | Alfalfa, Major | 33,386 | 26,075 |
| 2 | Beckham, Dewey, Ellis, Rober Mills (2 Senators) | 62,067 | 53,352 |
| 1 | Beaver, Harper, Cimarron, Texas | 40,622 | 28,652 |
| Total | | 223,945 | 181,710 |

### SIX LARGEST DISTRICTS:

| Dist. No. | Counties | 1910 | 1940 |
|---|---|---|---|
| 31 | Tulsa | 34,995 | 193,363 |
| 14 | Oklahoma, Canadian (2 Senators) | 108,733 | 271,488 |
| 23 | Pontotoc, Seminole | 44,295 | 100,993 |
| 11 | Creek, Payne | 49,958 | 91,110 |
| 34 | Osage, Washington | 37,585 | 72,061 |
| 32 | Okmulgee, Wagoner | 43,201 | 71,743 |
| | Total | 318,767 | 800,758 |

It will be seen that the six least populous districts have lost 42,235 in population during the 30-year period, and in the aggregate are entitled to but three Senators instead of seven, which they now have. On the other hand, the six most populous districts' have gained 481,991 in population during the same period, and in the aggregate are entitled to 15 Senators instead of the seven which they now have. The result is that each voter in the six overrepresented and least populous districts has more than four times as much voice in the Senate as each voter in the six underrepresented and most populous districts. And each voter in Marshall and Love counties, district No. 26, has over eight times as much voice in the Senate as each voter in Tulsa county, district No. 31. An examination of a table containing the population of each senatorial district in the state discloses that 23 Senators, constituting a majority of the Senate, are elected from counties having a population of 776,321, while the remaining 21 Senators are elected from counties having a population of 1,560,-113. Thus less than one-third of the voters of Oklahoma elect a majority of the Senate. The wisdom of the makers of the Constitution in requiring the Legislature to reapportion the two houses of the Legislature once in every ten-year period, so as to provide for the shifts in population and equalize representation, is well illustrated by these figures.

Although he complains chiefly of the statutes relating to senatorial apportionment, petitioner also attacks the statutes apportioning representation in the House of Representatives. Under sections 10 (d) and (g), art. 5, of the Constitution, it is the mandatory duty of the Legislature to attach each county having less than half a ratio of population to an adjoining county for the purpose of representation in the House. The population of the state, as shown by the federal census, for the years 1910, 1920, 1930, and 1940, was, respectively, as follows: 1910—1,657,155; 1920—2,028,285; 1930 — 2,396,040; and 1940 — 2,336,434. In the apportionment acts for the House of Representatives enacted immediately succeeding the taking of the federal census for each of said years, each county in the state was given one or more representatives. No county was attached to another, as required by section 10 (g), despite the fact that two counties (Cimarron and Harper) each had less than one-half a ratio under both the census taken in 1910 and in 1920, despite the fact that five counties (Cimarron, Harper, Beaver, Ellis, and Love) each had less than one-half a ratio under the census taken in 1930, and despite the fact that eight counties (Cimarron, Harper, Texas, Beaver, Ellis, Roger Mills, Harmon, and Love) each had less than one-half a ratio under the census taken in 1940.

The condition thus shown to exist is one of grave concern. The principle of equality of representation lies at the very heart of representative government. 18 Am. Jur. 192, § 17. This principle was enjoined upon the Legislature by the cited constitutional provisions. At the ballot box, in a representative government, each citizen is supposed to be, and should be, the equal of every other citizen, and all are entitled to approximately an equal voice in the enactment of laws through elected representatives. It was not the intention of the framers of the Constitution, or of the people who adopted it, that citizens of one county should have representation in the two houses of the Legislature out of all proportion to that enjoyed by the citizens of other counties, except in the few instances above noted.

The Kentucky court has well said:

"Equality of representation in the legislative bodies of the state is a right preservative of all other rights. The source of the laws that govern the daily lives of the people, the control of the public purse from which the money of the taxpayer is distributed, and the power to make and measure the levy of taxes, are so essential, all-inclusive, and vital that the consent of the governed ought to be obtained through representatives chosen at equal, free, and fair elections. If the principle of equality is denied, the spirit, purpose, and the very terms of the Constitution are emasculated. The failure to give a county or a district equal representation is not merely a matter of partisan strategy. It rises above any question of party, and reaches the very vitals of democracy itself." Stiglitz v. Schardien, 239 Ky. 799, 40 S.W. 2d 315, 321.

That the acts complained of do not comply with the requirements of the Constitution is plain. The senatorial districts created do not "contain as near as may be an equal number of inhabitants," and representative districts have not been created in accordance with the mandatory provisions of sections 10 (d) and 10 (g), as above pointed out. While it is impossible to apportion representation in the two houses with mathematical exactness, and the Legislature is, and should be, allowed some discretion in enacting such statutes, yet the provisions of the Constitution require at least as close an approximation to exactness and equality as is reasonably possible. In re Sherill v. O'Brien, 188 N. Y. 185, 81 N. E. 124, 117 Am. St. Rep. 841; Stiglitz v. Schardien, above; Giddings v. Blacker, 93 Mich. 1, 52 N. W. 944, 16 L.R.A. 402; 2 A.L.R. 1345. note. The Kentucky court, in Stiglitz v. Schardien, above, in a case where the inequality was not so great as in Oklahoma, used this language, which is pertinent here:

"The inequality is so glaring that it repels any presumption that the legislation constituted a fair approximation of what was required by the fundamental law. It represents an instance where fair-minded men can entertain no doubt that the inequality of representation is grave, unreasonable, and unnecessary."

The rule is that constitutional provisions are mandatory, unless it appears from their express terms or by necessary implication from the language used that they are intended to be directory only. 12 C. J. 740; 6 R. C. L. 55. The word "shall" is used throughout the constitutional provisions relating to legislative apportionment, and those provisions are mandatory, as are apportionment provisions generally. 11 Am. Jur. 688; Parker v. State, 133 Ind. 178, 32 N. E. 836, 18 L. R. A. 567. And the courts have not hesitated to strike down statutes in conflict with similar apportionment provisions. 18 Am. Jur. 194, 195.

Respondents do not seriously contend that the acts under consideration meet the constitutional requirements, but urge, rather, that petitioner may not maintain the action, and that we are without power to consider the questions presented or to grant the relief prayed. The importance of the questions, affecting as they do the fundamental rights of the people, requires that we pass upon the various contentions made, even though, as we shall point out, we can give no effective relief.

1. Respondents contend that the question presented is political rather than judicial in nature, and that the courts are without jurisdiction of such a case. They say that we have no jurisdiction under art. 5, sec. 10 (j), of the Constitution, which provides that "An apportionment by the Legislature shall be subject to review by the Supreme Court at the suit of any citizen, under such rules and regulations as the Legislature may prescribe," since the Legislature has not vitalized said provision by prescribing rules and regulations for such review. They also argue that the specific grant of power contained in said section, though not vitalized, must be deemed to exclude jurisdiction under any other theory or constitutional provision.

At the time our Constitution was

framed, the New York Constitution contained a provision substantially the same as section 10 (j), above. In the case of In re Sherill v. O'Brien, above, decided April 3, 1907, and before our Constitution was framed, the New York Court of Appeals had under consideration the effect of said constitutional provision, and it was held that despite the failure of the Legislature to prescribe rules and regulations for such review, the New York Supreme Court (a court of general original jurisdiction such as is our district court) had jurisdiction to pass upon the constitutionality of apportionment acts when its jurisdiction was properly invoked under the Code of Civil Procedure, and that the Court of Appeals (the court of last resort such as is this court) had jurisdiction to entertain an appeal in such a case. It was held in effect that the provision similar to article 5, sec. 10 (j), of our Constitution does not withdraw from the courts jurisdiction to pass upon the constitutionality of apportionment acts until the Legislature does prescribe rules and regulations for review under the grant of power therein contained. One Justice was of the opinion that the provision is self-executing, but the majority opinion does not so hold.

By article 7, sec. 2, of our Constitution it is provided:

"The original jurisdiction of the Supreme Court shall extend to a general superintending control over all inferior courts and all commissions and boards created by law. The Supreme Court shall have power to issue writs of habeas corpus, mandamus, quo warranto, certiorari, prohibition, and such other remedial writs as may be provided by law, and to hear and determine the same."

Michigan and Wisconsin have similar constitutional provisions, and it is held in each state that under such provision the Supreme Court has original jurisdiction to review legislative apportionment acts and issue writs necessary to carry into effect judgments holding such acts unconstitutional. Giddings v. Black-

er, above; State v. Cunningham, 81 Wis. 440, 51 N. W. 724, 15 L. R. A. 561; also, State ex rel. Lamb v. Cunningham, 83 Wis. 90, 53 N. W. 35, 17 L. R. A. 145, 35 Am. St. Rep. 27.

Most of the courts, in passing upon the constitutionality of legislative apportionment acts, have based their jurisdiction upon the broad ground that it is always a proper function of the courts to pass upon the constitutionality of acts of the Legislature when their jurisdiction is properly invoked, and they have not thought it necessary to find express constitutional authority for such action. See People v. Board of Supervisors, 138 N. Y. 95, 33 N. E. 827; In re Sherill v. O'Brien, above; Parker v. State, above; Ragland v. Anderson, 125 Ky. 141, 100 S.W. 865; Harmison v. Ballot Com'rs, 45 W. Va. 179, 31 S. E. 394, 42 L. R. A. 591; State ex rel. v. Wrightson, 56 N. J. L. 126, 28 Atl. 56, 22 L. R. A. 548; Attorney General v. Suffolk County Apportionment Comm., 224 Mass. 598, 113 N. E. 581; State ex rel. v. Hitchcock, 241 Mo. 433, 146 S. W. 40; 2 A. L. R. 1337, note. Most cases decided under this theory originated in the lower courts and were reviewed by the courts of last resort in the exercise of their appellate jurisdiction.

It might be well to point out that in 1938, the courts of 22 states had exercised the power, or had stated that they had the power, to review legislative apportionment acts upon constitutional grounds, and no court had denied that it possessed such power. Vol. 95, Annals of Am. Acad. Pol. & Soc. Science, p. 11. See, also, 18 Am. Jur. 197; and 2 A. L. R. 1337, note. Since that time the Supreme Court of Ohio has likewise taken jurisdiction of such a case and compelled action. State ex rel. Herbert v. Bricker (1942) 139 Ohio, 499, 41 N. E. 2d 377. In most of the cases the relative difference between the most populous and least populous districts was not so great as that which exists in Oklahoma, as the following table of cases, holding apportionment acts unconstitutional, will illustrate:

| In re Sherill v. O'Brien, 188 N. Y. 185, 81 N. E. 124 | Most Populous District | Least Populous District |
|---|---|---|
| In re Sherill v. O'Brien, 188 N. Y. 185, 81 N. E. 124 | 246,187 | 97,717 |
| Brooks v. State, 162 Ind. 568, 70 N. E. 980 | 17,775 | 10,787 |
| Atty. Gen. v. Suffolk Comm. 224 Mass. 598, 113 N. E. 581 | 6,182 | 1,957 |
| Williams v. Sec. of State, 145 Mich. 447, 108 N. W. 749 | 116,033 | 52,000 |
| Rogers v. Morgan, 127 Neb. 456, 256 N. W. 1 | 21,181 | 8,094 |
| State v. Cunningham, 83 Wis. 90, 53 N. W. 35 | 65,952 | 30,732 |
| Stiglitz v. Schardein, (Ky) 40 S. W. 2d 315 | 128,595 | 39,210 |

We are of the opinion, and hold, that under article 7, sec. 2, above, we have jurisdiction of the present action. As has been well said of similar constitutional provisions, that section gives the Supreme Court original jurisdiction to issue the named writs to safeguard the "sovereignty of the state, its franchises or prerogatives or the liberties of its people." State v. Frear, 148 Wis. 456, 134 N.W. 673, L.R.A. 1915B, 569; 7 R. C. L. 1075; 14 Am. Jur. 457. And, as was impliedly held by the New York court in the Sherill v. O'Brien Case, above, article 5, sec. 10 (j), above, was not intended to deprive the courts of jurisdiction to pass upon the constitutionality of apportionment acts under authority contained in other provisions of the Constitution. Having reached this conclusion, we find it unnecessary to decide the very doubtful questions as to whether the provisions of section 10 (j), above, are self-executing.

2. Respondents next argue that petitioner may not maintain this action because he shows no injury to himself. The gist of the argument is that if all apportionment acts since statehood were invalidated and the original apportionment made by the Constitution held to be in effect, petitioner, as a citizen of Tulsa county, would still have no more representation than now. But a citizen has more than the mere right to have his own county or district fully represented in the Legislature. Discrimination may result from giving other counties too much representation as well as from giving a particular county insufficient representation. Each citizen has a right to have the state apportioned in accordance with the provisions of the Constitution, and to be governed by a Legislature which fairly represents the whole body of the electorate, elected as required by the provision of the Constitution. Stiglitz v. Schardein, above; State v. Wrightson, above.

3. Having decided that the question is one within our jurisdiction, and that the challenged statutes do not comply with the requirements of the Constitution, the next question for determination is whether any relief should be granted.

It may be well to first point out the things that we may not do. We may not make the reapportionment ourselves, since that duty is legislative in nature, and is, by article 5, secs. 9 and 10 of the Constitution, vested in the Legislature. Such is the holding of the courts of the other states under constitutional provisions similar to ours. Parker v. State, above; Burns v. Flynn, 281 N. Y. S. 495, aff. 281 N. Y. S. 497; 245 App. Div. 799, aff. 268 N. Y. 601, 198 N. E. 424; Williams v. Secretary of State, 145 Mich. 447, 108 N. W. 749. Assuming that section 10 (j), above, is self-executing, it does not follow that this court would have authority to revise and change the districts as fixed by the Legislature and as urged by the petitioner. While in some instances the words "review" and "revise" are used synonymously, we do not believe the framers of the Constitution so used the

word "review" in said provision. This court should not assume such authority, which is generally considered a legislative function, except where the language used in plain and compelling. It should not do so by a process of construction of language of doubtful meaning. Neither may we, by mandamus or otherwise, require the Legislature to enact proper apportionment statutes. The theory of separation of the powers of government prevents our doing so. The Legislature, being a co-ordinate branch of the government, may not be compelled by the courts to perform a legislative duty, even though the performance of that duty be required by the Constitution. 18 R. C. L. 186; Fergus v. Marks et al., 321 Ill. 510, 152 N. E. 557, 46 A. L. R. 960; Parker v. State, above. And finally we may not try title to legislative offices or enjoin the payment of legislative salaries. Fergus v. Kinney, 333 Ill. 437, 164 N. E. 665; In re Sherill v. O'Brien, above.

This problem, created by lack of power on the part of the courts to affirmatively enforce constitutional provisions relating to apportionment, has not been confined to Oklahoma alone. Overrepresentation of the less populous areas has been the rule, rather than the exception, among the other states of the Union. And that Legislatures have been traditionally slow to enact apportionment statutes meeting the requirements of State Constitutions is evidenced by the great number of reported cases on the subject. See 2 A. L. R. 1337, note. The overrepresented counties and districts simply do not relinquish the advantage they possess. They fight to retain it. To overcome this legislative inaction and secure a just apportionment, different states have used or adopted different means. Colorado and Washington have used the initiative and referendum to enact proper statutes. Other states have solved the problem by the adoption of special constitutional provisions. Thus the Constitutions of California and South Dakota now provide that in the event the Legislature fails to act within a certain time, apportionment shall be made by a board composed of certain state officials. In Ohio, a special board, and in Maryland, the Governor, apportion representation after each census, but they have no power to alter districts. In Ohio this board may be required by mandamus to make a correct apportionment. State v. Bricker, above. A recent constitutional amendment, adopted by the people of Arkansas, provides that a board composed of the Governor, the Secretary of State, and the Attorney General shall reapportion the state after each decennial federal census, and that the Supreme Court shall have power to compel the board to act, as well as to *revise* any action taken by the board not in accordance with the Constitution.

But the people of Oklahoma have adopted no constitutional provisions like those found in California, South Dakota, Ohio, Maryland, and Arkansas, and our power to pass upon the constitutionality of apportionment acts does not include the power to *revise* or correct them. If, however, such acts are found to be in conflict with the Constitution, we may, where justice requires it, declare them to be invalid and enforce our decree by proper writs running to election officials. State v. Cunningham, above; 16 C. J. S. 438; 18 Am. Jur. 197.

But, though it may be conceded that we have the power to declare all apportionment statutes enacted since statehood void and to require the next election to be held under the apportionment made by the Constitution, it does not follow that we should do so. The result of such action would be to increase the inequality of representation already existing. For example, Logan county with a population of but 25,245 would have three members of the House of Representatives and one Senator, while Oklahoma county with a population of 244,159 would have but four members of the House of Representatives and one resident Senator. And Tulsa county with a population of 193,363 would have but one member of the

House of Representatives, would share another member with Creek county, and would share its one Senator with Washington county. Seven of the eight counties having a population of less than half a ratio, and not now entitled to a representative, would each have a representative, while Harmon and Cotton counties, which were not created until after the adoption of the Constitution, would be without representation in either house. Other instances could be given showing that the discrimination in favor of the counties with small populations and against those with large populations would only be aggravated by adjudging all the apportionment acts void and requiring Senators and Representatives to be elected under the apportionment made by the Constitution.

In such cases the courts are divided upon the question of whether the relief prayed for should be granted. Under one view the courts will direct the election to be held under the last valid law, regardless of consequences (Williams v. Secy. of State, 145 Mich. 447, 108 N.W. 749), while under another view the courts will decline to interfere. State ex rel. v. Schnitger, 16 Wyo. 479, 95 P. 698; 18 Am. Jur. 198. In Wyoming, as in Oklahoma, the apportionment was made by the Constitution, and the subsequent apportionment acts did not comply with the constitutional requirements. The constitutional apportionment was intended to be only temporary. New counties had been created since the adoption of the Constitution, and such counties would have been without representation if elections had been held in accordance with the constitutional apportionment. Under such circumstances the Wyoming court, in the cited case, refused to compel elections to be held under the constitutional apportionment. The case is in point here, and we think the reasoning sound. The writ of mandamus is a writ of discretion, not one of right, and will not be granted where more harm than good will result from its issuance. 34 Am. Jur. 830; Strother v. Bolen, 72 Okla. 310, 181 P. 299. We must deal with the problem realistically,

and should refuse to exercise the powers given us when to do so would merely increase the wrongs sought to be prevented. We decline to further diminish the representation of an already underrepresented group or to increase that of an already overrepresented group, under the guise of affording relief.

Nor should we take such action in an effort to indirectly coerce the Legislature into enacting a proper apportionment statute. The legislative, the executive, and the judicial departments are equal and co-ordinate branches of our government, and none of them may arrogate to itself control over either of the others. Fergus v. Kinney, 333 Ill. 437, 164 N. E. 665.

This is apparently the first time any citizen has seen fit to challenge, in this court, the apportionments as made by the laws enacted since statehood, and, in view of the foregoing discussion, we assume that, since we have pointed out the defects in the present laws, the next Legislature will enact a new and proper apportionment statute. Furthermore, the people may initiate such a bill (Const. art. 5, sec. 2; Armstrong v. Mitten, 95 Colo. 425, 37 P. 2d 757), or they may follow the example of other states above mentioned, and amend the Constitution to take the power of apportionment from the Legislature and vest it in a special officer or board representative of the state as a whole.

4. In the event a new apportionment act is passed, either by the Legislature or by the people, we think it well to point out that the following principles, expressed or implied in the Constitution, must be observed:

(a) While the primary duty of apportioning the state rests upon the first Legislature elected after each decennial federal census, the duty is a continuing one, and if the first Legislature fails to enact a valid law, the duty devolves upon each succeeding Legislature until it is performed. 18 Am. Jur. 190; Fergus v. Kenney, above; People v. Rice, 135 N. Y. 473, 31 N. E. 921, 16 L. R. A. 836;

State v. Weatherill, 125 Minn. 336, 147 N.W. 105; Botti v. McGovern, 97 N.J. L. 353, 118 Atl. 107; In re Opinion of the Judges, 61 S. D. 107, 246 N. W. 295.

(b) Once a valid law is enacted no further act may be passed by the Legislature until after the next federal decennial census. Const. art. 5, secs. 9 (a), 10 (b), 10 (c); Harmison v. Ballot Com'rs, above; 18 Am. Jur. 190, and cases there cited.

(c) Counties containing less than one-half of a ratio of population may not be made whole representative districts, but *must* be attached to other counties. Const. art. 5, sec. 10 (g).

(d) Under the privisions of article 5, sec. 9 (a), the state must be divided into at least 44 senatorial districts, each of which shall elect one Senator. The Senate may consist of more than 44 members only to the extent that single counties are entitled to more than two Senators. For example, if a reapportionment were made at the present time, Tulsa county would be entitled to three Senators and Oklahoma county would be entitled to four Senators. The Senate would thus consist of 47 members. At least two senatorial districts should be created in each of Oklahoma and Tulsa counties. The 75 remaining counties should be divided into 40 districts, each electing one Senator. Upon the question of whether the two additional Senators from Oklahoma county and the one additional Senator from Tulsa county must come from separate districts or may be elected from other districts or at large by the voters of the counties, the Constitution is not clear. Either method would be permissible, so long as substantial equality prevails.

(e) We find nothing in the Constitution requiring apportionment of both senatorial and representative districts to be effected by a single act, as argued by petitioner.

Lest anything we have said be construed to cast doubt upon the validity of acts heretofore passed by the Legislature, we point out that, under the provisions of article 5, sec. 30, of the Constitution, each house is the sole judge of the "election, returns, and qualifications of its own members," and the members actually chosen, when received by the members of either house, become de jure as well as de facto members of that body, even though elected under invalid apportionment acts. State v. Schnitger, above; In re Sherill v. O'Brien, above. It follows that no act of the Legislature may be challenged on such account.

In view of our decision we need not pass upon the other questions presented.

The application for the writ of mandamus and other relief is denied.

CORN, C. J., GIBSON, V. C. J., and OSBORN and DAVISON, JJ., concur. WELCH and BAYLESS, JJ., concur in conclusion. RILEY and ARNOLD, JJ., concur in part and dissent in part.

———

RILEY, J. (dissenting). If the opinion of the Justices comprising a majority of the Supreme Court could be considered as a legislative committee's report to the regularly constituted authority charged by the highest of mandates with the duty of enacting salutary laws to provide a safeguard to the right of suffrage, I would quite heartily concur. Unfortunately, the time for that consideration has long since expired. The 18th and 19th Legislatures have adjourned, sine die. Moreover, the petitioner on behalf of himself and all citizens similarly situated has elected to present his right based upon an alleged grievous neglect and wrong to this judicial forum. He seeks here not only an adjudication of a wrong, but likewise a remedy to afford relief.

By the opinion of my fellows, the petitioner's alleged wrong has been adjudged to exist in fact. Likewise, it has been adjudged that petitioner is entitled to relief because of both things done by the Legislature which ought not to have been done, and because of things left undone which ought to have been done. Nevertheless, the petitioner

is left, insofar as the Legislature and the judiciary is concerned, without all manner of remedy. The cause is a matter *publici juris*. It ought not to be lightly considered. The basis of English, American, and French idealogy is involved — representative government, intended to be predicated upon equality so as to be preservative of liberty rather than emasculatory of democracy and a written Constitution, under which all political power is recognized as being inherent in the people (sec. 1, art. 2, Bill of Rights, Constitution of Oklahoma), and wherein a means is provided for expression and protection of political and property rights in elections, which, if to be as intended by the significance of the word, must be by the voters' impartial exercise of an individual discretion in the selection of candidates for office and upon the merits of measures submitted under the power reserved to the people by initiative and referendum rights. The basic law commands that "The elections shall be free and equal." (Section 7, art. 3, Constitution.)

My associates have adjudged lack of equality in legislative representation in the Senate and House of Representatives as provided by all statutes since statehood. That adjudication was based upon the public record. But, as I shall attempt hereinafter to show, the majority has extended too far their finding of legislative dereliction. The judgment, notwithstanding the relief denied, has been predicated upon an assigned reason of dealing "realistically" with the problem, and relief has been denied because it would "merely increase the wrong sought to be prevented"; and lest the Legislature be coerced into "enacting a proper apportionment," and lest it be thought that the judiciary has arrogated to itself control over some one of the equal and co-ordinate departments of our government. Fergus v, Kinney, 333 Ill. 437, 164 N. E. 665. Here I part way with the majority. *Ubi jus ibi remedium.*

Whenever the law gives anything, it gives a remedy for the same. If a man has a right in court or elsewhere, he must have a means to vindicate it, otherwise right is not real but a fanciful vision amounting to a mere urge to accomplish something which without a remedy is a mere grievance or complaint; ". . . it is a vain thing to imagine a right without a remedy, for want of right and want of remedy are reciprocal." Broom's Legal Maxims (10th Ed.) page 118. Thus, *jus,* or "the legal authority to do or to demand something," does not exist for any good purpose except by *remedium.* Action or remedy may be had as a means not to be allowed or withheld by the will of a judge, in the exercise of an equitable discretion, but a remedy given by law for the recovery or possession of a right. Remedy, then, is merely the legitimate mode of enforcing a right. The Constitution (sec. 10 (j), art. 5) provides that at suit of any citizen an apportionment of the Legislature shall· be subject to review by the Supreme Court. Thus a right of action was conferred by the mode most effective. Likewise, the constitutional provision conferred upon the Supreme Court authority, jurisdiction, and power to review the subject matter of the right of action granted to the citizen. The constitutional grant of a right and conferment of jurisdiction will not be presumed to have existed in vain; nor can this court rightfully avoid or evade doing its duty, though the heavens fall. Indeed, by our oaths we are bound to uphold and defend the Constitution, a part of which is the Bill of Rights, wherein, as particularly applicable to the judicial duty, after a recitation that the courts of justice shall be open to every person, a duty is mandated that there shall be speedy and certain remedy afforded for every wrong, and that both right and justice shall be administered without sale, denial, delay, or prejudice.

A part of due process as defined by section 7, art. 2, Constitution of Oklahoma, is that no person shall be deprived of life ·or property except by law of the land. Ex parte Sullivan, 10

Okla. Cr. 465, 138 P. 815, Ann. Cases 1916A, 719.

As this court in this case of first impression now construes constitutional provisions, there is no law of the land within this jurisdiction by which the basic sovereign right, insofar as representative government is concerned within the State of Oklahoma, may be made effective to "preserve the purity of the ballot." Section 6, art. 3, Constitution.

The citizen in a representative form of government can have no greater privilege than the right of equal representation and control of the law-making department of his government. Equality and uniformity constitute the watchword of apportionment laws, and when that watchword is despoiled by invasion or neglect, not only may a citizen maintain an action in his own name to enforce his constitutional privileges, but additionally he has the right of remedy to require resort to whatever valid apportionment the basic law has given him.

It is not insisted that the equality of representation is to be made mathematically exact; that would indeed be perfect. Perfection is divine! All that is constitutionally required is relative accuracy consisting of ordinary knowledge of the state and application of that knowledge under a rule of common justice to its population.

In Parker v. State, 133 Ind. 178, 18 L. R. A. 567, 32 N. E. 836, the view is that it is beyond the power of courts to review the action of the Legislature within the scope of the discretion vested in it by the Constitution, though it may have performed its duty very imperfectly.

In State ex rel. Barrett v. Hitchcock, 241 Mo. 433, 146 S. W. 40, the court declined to interfere where any discretion has been exercised by the Legislature, even though the exercise of that discretion has exceeded the general bounds limiting its discretion, and courts have been loath to inquire into the motives that prompted the Legislature in such matters, preferring to leave the responsibility of a co-ordinate branch of the government to the people who elected it.

The requirement of section 9 (a), art. 5, Constitution, is that the population of each district "shall contain as near as may be an equal number of inhabitants." And the requirements of section 9 (a), Id., are that "such population to be ascertained by the next preceding federal census, or in such manner as the Legislature may direct, and shall be in as compact form as practicable . . . and shall at all times consist of contiguous territory."

Thus, in exercise of the legislative discretion, not only is the population to be considered, but as well the territory embraced. In other words, the territory shall not be unduly "gerrymandered," the term applied to describe an apportionment of representative districts so contrived as to give an unfair advantage to the party in power. John Fiske in his Civil Government in the United States says that in 1812, when Gerry was Governor of Massachusetts, the Democratic Legislature, to secure an increased representation of the Democratic party in the State Senate, redistributed the districts in such wise that the shapes of the towns forming a single district in Essex county gave to the district a somewhat dragon-like contour. This was indicated upon a map of Massachusetts which Benjamin Russell, an ardent Federalist and editor of the Centinal, hung up over the desk in his office, and the painter Gilbert Stuart, coming into the office one day, and observing the uncouth figure, added with his pencil a head, wings and claws, and exclaimed "That will do for a salamander." "Better say a gerry-mander," growled the editor; and the outlandish name, thus duly coined, soon came into general currency. Stuart's drawing, reproduced in Fiske's book, was so contrived as to make the back line of the creature's body form a caricature of Gerry's profile. Eng. Britannica (11th Ed.) page 904.

As stated in Sherill v. O'Brien, 188 N. Y. 185, 117 Am. St. Rep. 841, 81 N. E. 124:

"It is difficult, and perhaps impossible, to state rules by which future apportionments can be measured."

In People ex rel. Baird v. Broom, 138 N. Y. 95, 20 L. R. A. 81, 33 N. E. 827, it is said:

"We have no trouble whatever in detecting the difference between noon and midnight; but the exact line of separation between the dusk of the evening and the darkness of advancing night is not so easily drawn."

But, broadly expressed, equality of population and compactness of territory are required for true apportionment. The political expediency or trick of gerrymandering has never been attributed to the majority party represented in the Oklahoma Legislature, though on occasion it has been said that the once Republican majority adjourned sine die without passage of the general appropriation measure, so as to force calling of a special session. The discretion vested in the Legislature must embrace equality of population and compactness of territory. The courts are disinclined to interfere where they find any discretion has been exercised by the Legislature, even though the exercise of that discretion has exceeded the general bounds limiting its discretion. State ex rel. Barrett v. Hitchcock, supra. And it is only where it clearly appears that in the formation of any district the requirement of compactness of territory and equality in population has been wholly ignored, and has not been considered or applied to any extent, that the statute will be declared unconstitutional. Denney v. State, 144 Ind. 503, 31 L. R. A. 726, 41 N. E. 929. Approximation to the dual constitutional requirements is not reviewable by the courts except for gross abuse of discretion. Ibid. The apportionment must be so vicious in its nature as to transcend the constitutional power of apportionment. Brophy v. Suffolk County Appor-

tionment Commissioners, 225 Mass. 124, 113 N. E. 1040; Williams v. Secretary of State, 145 Mich. 447, 108 N. W. 749. The duty is administrative or legislative, restrained only by the Constitution, when it appears that there is a clear and palpable violation of fundamental law. State ex rel. Meighen v. Weatherill, 125 Minn. 336, 147 N. W. 105. The courts cannot overturn an apportionment act, passed within constitutional limitations, on the ground that it is unwise, impolitic, unjust, or oppressive, or even that it was procured by corrupt means. Ibid. And courts will assume that those charged with the duty were thoroughly familiar with the territory and had an intimate knowledge of its towns, topography, and means of communication. Smith v. St. Lawrence County, 148 N. Y. 187, 42 N. E. 592. And where some discretion is vested in the Legislature, the courts cannot inquire into the motives of the legislators in exercising such discretion. Sherill v. O'Brien, supra. Courts must be warranted in saying that there is no apportionment. State ex rel. Gallagher v. Campbell, 48 Ohio St. 435, 27 N. E. 884. For the wisdom or lack of wisdom in the exercise of legislative discretion, legislators are answerable to the citizenship and no one else. Ibid.

The provisions of section 9 (a), art. 5, Constitution, do not require that the population be ascertained by the next preceding federal census, but such population may be ascertained "in such manner as the Legislature may direct." When a general judgment in court is rendered, it will be presumed, in absence of proof to the contrary, that the judgment was entered upon a proper finding of facts, and that the facts actually exist. While a hearing, with all of its significance, is a part of due process in judgments rendered by courts, a hearing is not a prerequisite to the enactment of statutes. But to sustain statutes, courts will indulge the presumption of knowledge on the part of the Legislature, however that knowledge may have been had, so that ascertainment of population for legislative

apportionment may be in such manner as the Legislature may direct, and that knowledge may be derived through familiarity with the territory, towns, topography, etc. Smith v. St. Lawrence County, supra.

Daniel Webster resolved the equation of legislative discretion when, as chairman of a senatorial committee engaged in devising an apportionment, he said:

"The Constitution, therefore, must be understood, not as enjoining an absolute relative equality, because that would be demanding an impossibility, but as requiring Congress to make an apportionment of representatives among the several states, according to their respective numbers, as nearly as may be. That which cannot be done perfectly must be done in a manner as near perfection as can be. If exactness cannot, from the nature of things, be attained, then the nearest practicable approach to exactness ought to be made. Congress is not absolved from all rule, merely because the rule of perfect justice cannot be applied. In such a case approximation becomes a rule. It takes the place of the other rule, which would be preferable, but which is found inapplicable, and becomes itself an obligation of binding force. The nearest approximation to exact truth or exact right, when that exact truth or exact right cannot be reached, prevails in other cases, not as a matter of discretion, but as an intelligible and definite rule, dictated by justice, and conforming to the common sense of mankind — a rule of no less binding force in cases to which it is applicable, and no more to be departed from than any other rule."

In the years 1911, 1921, 1931, and 1941, statutes apportioning the state for representation in the House were enacted (Session Laws 1910-11, page 266; Session Laws 1921, page 69; Session Laws 1931, page 9; Session Laws 1941, page 39); but it is true there had been no general apportionment of the state affecting the senatorial office since statehood. The only criticism of apportionment for the House is failure of the Legislature to attach each county having less than one-half a ratio of population to an adjoining county for the purpose of representation. As measured by the last decennial federal census, it is said that each county in the state was given one or more representatives, but that no county was attached to another as required by section 10 (g), art. 5, Constitution, despite the fact that two counties, Cimarron and Harper, each had less than one-half a ratio under the federal census in 1910 and 1920; and five counties, Cimarron, Harper, Beaver, Ellis, and Love, had less than one-half a ratio under the federal census taken in 1930; and eight counties, Cimarron, Harper, Texas, Beaver, Ellis, Roger Mills, Harmon, and Love, each had less than one-half a ratio under the federal census taken in 1940. But, even so, the inequality is not of grave concern and fatal. It will be seen that Love county, less than one-half a ratio, adjoins no county similarly situated; that the other counties are largely in the Panhandle and represent a great expanse of territory, which counties have been a part of the "Dust Bowl" and from which those less hardy than pioneers may have temporarily departed during the calamitous years while the federal census was being taken, and that the true population was within the knowledge of the legislators. Moreover, assuming that these counties should have been attached for joint representation, the Panhandle excess constitutes only 3½ in the House representation, which, compared with the total representation within the state, may be said to fall within the rule of de minimis non curat lex, and that error, if any, ought to be corrected by amendment, and if not corrected, this court may exercise the power to enjoin the payment of salaries of those who are not true representatives. Additionally, the Legislature has power of expulsion of those who assume to be or are legislators. It is thought, with all of the imperfections, that the last legislative apportionment for the House of Representatives may be sustained.

Under the majority finding that there has been no approximation of perform-

ance of the duty enjoined upon the Legislature as to the Senate except *pro tanto* by detachment and attachment of certain counties to certain senatorial districts, the result must be that future elections as to the Senate should be based upon the constitutional apportionment, unless in the meantime a valid law is enacted. Such a result would not be disturbing because, as found, the majority of senatorial districts created by the Constitution remain, and at present 44 members of the Senate are elected from such districts.

"He has studied our Constitution .in vain who has not discovered that the keystone of that great instrument is equality — equality of men, equality of representation, equality of burden, and equality of benefits." Ragland v. Anderson, 125 Ky. Rep. 141.

Indeed, the principles of the Declaration of Independence are adhered to within its terms. All men are created free and equal. Rosseau's social compact embraced the idea of equality as does our constitutional requirement for uniformity of taxation (sec. 5, art. 10, Const.; sec. 30, art. 10, Const.), and for uniformity or equality of laws (sec. 59, art. 5, Const.). We would not have it otherwise. These "living oracles" to which reference is made make manifest the principle of equality on which society rests. Thus far throughout the ever-increasing exigencies of government's effort to cope with the complicated refinements of civilization, it hath been always the custom to observe that principle. State v. Cunningham, 83 Wis. 90, 53 N. W. 35, 17 L. R. A. 145, 35 Am. St. Rep. 27; Williams v. Secretary of State, supra; Denney v. State, supra; Harmison v. Ballot Comissioners, 45 W. Va. 179, 31 S. E. 394, 42 L. R. A. 591; State v. Wrightson, 56 N. J. Law, 126, 28 Atl. 56, 22 L.R.A. 548; Giddings v. Secretary of State, 93 Mich. 1, 52 N. W. 944, 16 L. R. A. 402; Parker v. State, supra; Commissioners v. Blacker, 92 Mich. 638, 52 N. W. 951, 16 L. R. A. 432; People v. Thompson, 155 Ill. 451, 40 N. E. 307; People v. Rice, 135 N. Y. 473, 31 N. E. 921, 16 L. R. A. 836; Baird v. Supervisors, 138 N. Y. 95, 33 N. E. 827, 20 L. R. A. 81.

The challenge of the Colonies to King George, as a prelude to war, was that ignorance of fact because of absence of precedent affords no excuse to deny right of suffrage, whereas ignorance-of law does. Their slogan was expressed in the familiar words "Taxation without representation is unjust," and when the yoke of a government not responsive to the needs of men was broken, it was largely because government had denied equality and representation. In proportion that suffrage is denied or withheld the government becomes oligarchical or monarchical, to which no people worthy of freedom will submit. Ragland v. Anderson, supra. When, as recited by the majority, "each voter in Marshall and Love counties, district No. 26, has over eight times as much voice in the Senate as each voter in Tulsa county, district No. 31," it is to say that seven men·out of every eight in Tulsa county are not represented at all. They are required to submit to taxation without representation.

"It was this kind of oppression which inspired that great struggle for freedom which began on Lexington Green in 1775, and ended at Yorktown in 1781. . . . No citizen will, or ought to, love the state which oppresses him; and that citizen is arbitrarily oppressed who is denied equality of representation with every other citizen of the commonwealth." Idem.

Equality of representation is the basis of patriotism. Thus it is sought to make plain that the issue presented in the cause at bar is not merely a political question involving identity of legislative members. Indeed the present Legislature has heretofore adjudged that as such a body has right to do. State ex rel. Herbert, Atty. Gen., v. Bricker, Governor, et al., 139 Ohio St. 499, 41 N.E. 2d 377; sec. 30, art. 5, Const. But, according to our recent decision in State ex rel. Cloud v. State Election Board et al., 169 Okla. 363, 36 P. 2d 20, 94 A. L. R. 1007, the provisions of section 30, art. 5, Constitution, do not di-

vest this Supreme Court of jurisdiction to determine upon the eligibility for elections of members of the House of Representatives, nor has this court hesitated to adjudge whether or not a Legislature is in session. Simpson v. Hill, 128 Okla. 269, 263 P. 635. Nor have the courts been without power to determine that a purported Legislature is not a Legislature but a mere assembly of citizens without rights save in their own proper persons. Upon this pronouncement, as reflected by the majority opinion, a rule of law is promulgated that "The Supreme Court may not try title to legislative offices or enjoin the payment of legislative salaries." I dissent: It will not be denied by any of my associates that the pronouncement is *dictum*, being the expression of an opinion on a point of law arising in a case which, however, is not necessary to the decision of the case; that it is therefore not binding on other judges. By other Justices among the minority it is thought the pronouncement is *obiter dictum*, being a saying or expression by way of an opinion not necessary to the judgment given of record and consequently of less authority. Moreover, it is thought by at least one Justice dissenting that the pronouncement is *mal obiter dictum*, and consequently erroneous. A part of the *obiter dictum* that is not *mal* is that the present but adjourned Legislature consists of de jure members in sufficient numbers, both in the House of Representatives and the Senate; that no doubt can be cast "upon the validity of acts heretofore passed by the Legislature." Until promulgation of the majority opinion, there was no determination that the legislative districts, House and Senate, were invalid, and whereas there may be a king, though an usurper upon the throne, nevertheless there must be a throne upon which the king may sit. Blackstone recites (1 Blackstone's Com. 204) that:

"In 1461, on the occasion of Edward IV, Parliament declared the previous Henrys of Lancaster usurpers; but, to avoid great' public mischief, also declared them kings *de facto*, and persons were punished in that reign for treason to Henry IV, not in aid of the lawful claimant of the crown."

This court recently held that there can be no *de facto* officer *where* there is no office to fill. There can be no de facto officer *when* there is no office to fill. Koch v. Keen (1927) 124 Okla. 270, 255 P. 690.

This view was supplemented by the rule promulgated by the Supreme Court of the United States in Norton v. Shelby County, Tenn., 118 U. S. 425, 6 Sup. Ct. 1121, 30 L. Ed. 178:

"While acts of a *de facto* incumbent of an office lawfully created by law and existing are often held to be binding from reasons of public policy, the acts of persons assuming to fill and perform the duties of an office which does not exist *de jure* can have no validity whatever in law."

"The doctrine," said the Missouri court, "presupposes an office which the law recognizes." Ex parte Snyder, 64 Mo. 58.

". . . mere possession of a public office is insufficient to make incumbent a 'de facto officer,' possession plus color of title to office, if office actually exists, is sufficient." Sheldon et al. v. Green, 182 Okla. 208, 77 P. 2d 114.

Mr. Justice Field, in Norton v. Shelby County, supra, recited for the Supreme Court of the United States:

"But it is contended that if the act creating the board was void, and the commissioners were not officers *de jure*, they were nevertheless officers *de facto*, and that the acts of the board as to a *de facto* court are binding upon the county. This contention is met by the fact that there can be no officer, either *de jure* or *de facto*, if there be no office to fill. As the act attempting to create the office . . . never became a law, the office never came into existence."

Now if the majority opinion is correct to the extent that the legislative apportionment acts are unconstitutional, and that the provision in the Constitution for legislative apportionment has spent its force, something more than a

mere "apparent existence" of the legislative office is necessary to give validity to acts of the present and future Legislatures, both House and Senate, for the interpretation of law obtains the force of law. If at all possible, for the public good, condemnation of all apportionment laws should not be extended because, as the Supreme Court of the United States said:

"An unconstitutional act is not a law; it confers no right, it imposes no duty; it affords no protection, it creates no office; it is in legal contemplation as inoperative as though it had never been passed . . ."

While there might have been in the past under the condemned legislative apportionment laws de facto legislators, and while there may be such now, and while their acts may be constitutional, and especially that of legislative adjudication as to who the members were and are, when we lose sight of the legislative apportionment provided in the Constitution, or adjudge that it has spent its force, we adjudge that there are no districts or legislative offices from which the next Legislature may be elected. If we give sanction to the legislative districts and offices created by the Constitution, we then contemplate districts from which legislators may come, more or less, and constituents which they may represent, more or less. I am less sanguine than the majority about the assumption that "The next Legislature will enact a new and proper apportionment statute," or that the people through an initiative will do so. The initiative has been found cumbersome and subject to contest, and the people are engaged in a great war effort. It may be inquired, upon whom did the primary mandatory duty rest to discharge the obligation imposed by the Constitution? The answer is plain: The 18th Legislature. Section 10 (b), art. 5, Constitution, provides:

"The apportionment of this state for members of the Legislature shall be made at the first session of the Legislature after each decennial federal census."

Upon whom does the secondary mandatory duty rest to review and enforce a legislative apportionment? The answer is equally plain. Section 10 (j), art. 5, Constitution, provides:

"An apportionment by the Legislature shall be subject to review by the Supreme Court at the suit of any citizen . . ."

The duty rests upon this court. Section 2, art. 7, Constitution, invests the Supreme Court with the power to issue writs of mandamus, quo warranto, certiorari, prohibition, "and such other remedial writs as may be provided by law," and also to determine the same; and the Supreme Court may exercise such other and further jurisdiction as may be "conferred upon it by law," whereby this court had power to afford relief.

It has never been doubted in this country since Marbury v. Madison, 1 Cranch (U. S.) 49, 2 L. Ed. 60, that an act of the legislative department of government contrary to the Constitution is void and subject to that declaration by the courts. Indeed, it was never doubted prior to Marbury v. Madison that an act of the legislative department of government contrary to the Constitution was void. That matter had previously been set at rest in Holmes v. Walton (1779, N. J.); Commonwealth v. Caton (1782, 4 Call. 5) in Virginia, by George Wythe and John Blair, both of whom were afterwards members of the Constitutional Convention, and Blair became an associate Justice of the Supreme Court. Trevett v. Weeden (1786, R. I.); Bayard v. Singleton (1787, N. C.); Kamper v. Hawkins (1793, Va.); Van Horne's Lessee v. Dorrance (1795, 2 Dallas 304). The Supreme Court of the United States, by Justice Patterson (Calder v. Bull, 1798, 3 Dallas, 386; Whittington v. Polk, 1802, Md., 1 Harris and Johnson 236) the old Court of Appeals under the Articles of Confederation, denounced as unconstitutional the law that assigned circuit duties to the Judges of that appellate tribunal. Judiciary debates of Congress

1802, and ancient British precedents, American Law Review, vol. 29, page 711. And in Doomsday Books it was recited "What power the King hath, he hath by law." "The greatest inheritance that the King hath is the law, for if there were no law, there would be no inheritance and consequently no King." Long prior to the decision in Marbury v. Madison, Virginia and Kentucky, under a policy of state rights, by resolution, had declared that the sovereign states had power to disregard unconstitutional acts of Congress, and to exercise a state right in making the determination. That doctrine had been suggested at the Constitutional Convention, with the idea of creating a Council of Revision to exercise a corrective influence over excessive or aggressive acts of Congress. The philosophy of the Virginia and Kentucky resolutions had become the ruling doctrine of the Republican party. The author of the creed of state rights sat in the President's chair. He was Thomas Jefferson. In Congress the delegation from Virginia and her daughter Kentucky ruled the Republican majority. The political question determined by the Supreme Court was by and through a decision amounting to a mere repetition of familiar law, but it was not enforced by issuance of a writ. That political issue was whether the states had the right to pronounce a federal law unconstitutional, and so null and void, or whether that power would be exercised by the federal judiciary. Marshall challenged politically and made the issue. He was an actor in the matter before him as a judge. The court declined to afford relief and not for the assigned reason that the judges willed not to do so, but because the court erroneously held that the 13th section of the Judiciary Act of 1789 was unconstitutional in conferring upon the Supreme Court the power to entertain original jurisdiction in the character of a case then before the court. That court, like the majority of this court, paid no attention whatever to a clause of the Federal Constitution which provided as to original jurisdiction conferred by the Federal Constitu-

tion "With such exceptions . . . as the Congress shall make," in view of which that power conferred by the Constitution was not exclusive and the rule *expressio unius est exclusio alterius* did not apply. Corwin 4-10; Beveridge p. 138. Jefferson said "To consider the judges the ultimate arbiters of all constitutional questions . . . would place us under the despotism of an oligarchy." 144 Idem. And as to Marshall, that the crafty and cunning Chief Justice huddled up his opinions in conclave and handed them down as departmental orders. Marshall avoided impeachment, such as befell his associate Samuel Chase, against whom he testified. But by the courageous action of Marshall, the federal judiciary was lifted to its high and true place. One element of national disintegration was suppressed, upon the field of battle it was destroyed. Beveridge's Life of John Marshall, vol. 3, page 114.

While the legal issue determined in Marbury v. Madison was neither intricate nor novel, the converse of the difficulty of the legal issue in the case at bar is not even comparable. The political issue is the same. It is whether the court will declare legislative acts void and adhere to the Constitution by decreeing and enforcing representation as constitutionally provided, or leave the right of suffrage to other agencies. As to the former, the majority opinion holds:

"By art. 5, § 11, of the Constitution the state was divided into 33 senatorial districts, 22 of them being given one Senator each and 11 being given two Senators each . . . (Two counties, Harmon and Cotton have been created since the Constitution was adopted.) *However, the framers of the Constitution intended that the legislative apportionment contained therein should serve only until 1911 . . . . The constitutional apportionment was intended to be only temporary.*"

Of course, the framers of the Constitution intended that the apportionment provided in the Constitution should be superseded decennially, but only by valid legislative acts adjusting represen-

tation in the House and Senate, as equitably as may be, and to this end specifications of equality, compactness, and limitations on numbers of Senators were detailed in the Constitution. And equally true, the framers of the Constitution made certain that there should be no hiatus in government. It was well known to them that without valid provision for an office, not even an usurper in office could, when challenged, lawfully remain to perform the functions of government; that by unconstitutionality and consequent invalidity of apportionment statutes, or failure to enact them, there would be no valid provisions for, or creation of, the legislative offices, with the result that there would and could be no future legislative department of government; that without a legislative department of government, Oklahoma would fail as a government republican in form, and that such a government was required by the Federal Constitution (sec. 4, art. 4), and that a means was therein provided to enforce the requirement:

"The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion, and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence."

That in all probability domestic violence, as a result of chaos, would ensue if a de jure or de facto Legislature could not be convened. Anglo-Saxon civilization afforded a rule of law: *Rex nunquam moritur.* And to avoid such chaos and violence, the Constitution was constructed to provide (sec. 10, art. 5):

"The House of Representatives, UNTIL OTHERWISE PROVIDED BY LAW, shall consist of not more than one hundred and nine members . . ."
—and provision was made for the then members to hold office "for two years," and that provision was joined with another so that "the representatives elected at the first election shall hold office until the 15th day succeeding the day of the regular state election in Nineteen Hundred and Eight"; and that provision was added to another: "That the day on which state elections shall be held shall be fixed by the Legislature," so that personnel of those previously elected to and constituting the House of Representatives might be and were changed. The changed personnel has been adjudicated by the responsible authority charged with determination of the "qualifications of its own members." Section 30, art. 5, Constitution. That adjudication of "The Legislature" provided by law has been found to be binding upon this court, and with that part of the judgment I am heartily in accord, notwithstanding that a future Supreme Court may not be bound by the *dictum,* so that in the future, by *quo warranto* or otherwise, the purported next Legislature and officers thereof may be required to meet the issue as to whether they collectively constitute the Legislature of Oklahoma (Simpson v. Hill et al., 128 Okla. 269, 263 P. 635, 56 A. L. R. 706), or whether this court should "enjoin the payment of legislative salaries," as has been done. Simpson v. Hill, supra, Farrelly v. Cole, State Auditor, 60 Kan. 356, 56 P. 492, 44 L. R. A. 464; Dixon et al. v. Shaw, State Auditor, 122 Okla. 211, 253 P. 500, 50 A. L. R. 1232; Dyer v. Shaw et al., 139 Okla. 165, 281 P. 776; Shaw v. Grumbine, 137 Okla. 95, 278 P. 311; State ex rel. Telle v. Carter, State Auditor, et al., 170 Okla. 50, 39 P. 2d 134; Shaw v. Carter, State Auditor, 148 Okla. 57, 297 P. 273; State ex rel. Cloud v. State Election Board, 169 Okla. 363, 36 P. 2d 20, 94 A. L. R. 1007.

"The Supreme Court may determine if candidate for Legislature is eligible." To avoid such legalistic controversy and chaos, such as that within the recent history of this state which provoked Governor Johnston to call out the militia under orders to prevent abortive assemblies purporting to be legislative in character (Simpson v. Hill, supra), and finally resulting in recriminations and impeachment of the Governor et al. (Legislative Journal), the Constitution, by section 11, art. 5, wisely provided:

"UNTIL THE APPORTIONMENT IS MADE BY THE LEGISLATURE after the next federal decennial census, the state, except as otherwise provided, shall be divided into thirty-three senatorial districts, each of which shall be composed of the counties as named . . ."

The framers of the Constitution neither recognized that the apportionment in the Constitution contained should serve only until the year 1911, nor that the constitutional apportionment was temporary. Some meaning must be attributed to each word, phrase, and sentence employed in the constitutional provision. *Verba cum affectu accepienda sunt.* The constitutional provisions are to be construed as the people adopting them understand the meaning. What other meaning can be attributed to the phrase "until otherwise provided by law," and the phrase "until the apportionment is made by the Legislature," except in the sense that if, as, and when the Legislature enacts valid legislative apportionment acts the constitutional provisions upon the subject are superseded? *Verbis legis non est recedendum,* and words are to be so understood that the object may be carried out rather than fail. Laws sometimes sleep but never die. *Pro tanto* then the constitutional legislative apportionment provisions are neither imperfect nor temporary. If they be imperfect in the sense that by applying them "the result would be to increase the inequality of representation already existing," my answer is, though any provisions of the Constitution be imperfect, I am bound to it by my oath. In view of the adjudicated invalidity of apportionment laws, it must be seen that resort to the power and provision of the Constitution is the only means of securing perpetuity of state government in Oklahoma. And when it is said there may not be a return to the valid constitutional provision because "Harmon and Cotton counties, which were not created until after the adoption of the Constitution, would be without representation in either House," it must be known that the fact of creation of the named counties subsequent to statehood and adoption of the constitutional provision would not in fact leave either the people or the territory embraced by the boundaries of these counties without representation in either House, because those parts of the state now designated as Harmon and Cotton counties were never, since statehood, unorganized territory nor simply parts of the public domain. The area and population were then afforded representation as such by the statesmen representing counties of which they were a part. Such was not the case in Wyoming (State ex rel. Sullivan v. Schnitger, Secretary of State, 16 Wyo. 479, 95 P. 698, 18 Am. Juris. 198), where there existed unorganized territory. Nor was any such situation presented as in the case of People v. Rice, 135 N. Y. 473, 31 N. E. 921, 16 L. R. A. 836, wherein the prior senatorial apportionment act of the year 1856, to which resort would otherwise have been made under the general rule (State ex rel. Lamb v. Cunningham, 83 Wis. 90, 53 N. W. 135, 73 L. R. A. 145, 35 Am. St. Rep. 27):

". . . the fact that the inequality of representation under it [a legislative apportionment statute] is no greater than under former apportionment acts is irrelevant, the language of the Constitution securing equality being plain and unambiguous."

Any number of legislative violations of plain and unambiguous constitutional provisions relating to apportionment of election districts cannot be regarded as abrogating provisions of the Constitution. Giddings v. Blacker, 93 Mich. 16, 52 N. W. 944, 16 L. R. A. 402. The antebellum conception embraced in the prior act provided that the population considered in the enactment excluded "persons of color not taxed." It was evident to the New York court that after the War of the Rebellion and adoption of the 13th, 14th, and 15th Amendments to the Federal Constitution, the elective franchise within the state was extended by operation of federal law, without regard to color, and there could be no return to the prior apportionment act be-

cause it would be "a travesty on the law and upon all ideas of equality, propriety and justice," and, in fact, the authority of the victorious Federal Union would not countenance application of such a prior law.

Other cases might be cited to show the real reason for the statement that "The courts are divided upon the question of whether the relief prayed for should be granted." Wherever such a return has been possible, it has been granted as a matter of right and not "regardless of consequences." Williams v. Secretary of State, 145 Mich. 447, 108 N. W. 749.

It is thought that the majority are in error when they say:

"While under another view the courts will decline to interfere." State ex rel. Sullivan v. Schnitger, supra.

The first division is not based upon the maxim *fiat justitia ruat coelum*, nor the latter division upon the will of the courts not to interfere. As judges we can will nothing, it is the will of the law, modified by principles of equity, the soul of law, that forms the fruits of our efforts to be bestowed or withheld according to right and justice.

The judiciary is afforded the working tools of facts to be measured by the law, leavened by equity. Judges are guardians of the law and designated by the Constitution as conservators of the peace. According to Daniel Webster, the hope of perpetuation of our nation lies in the judiciary which, like an equilateral triangle in its triune division of departments, with the legislative and executive is coequal, co-ordinate and coextensive; yet, under sec. 1, art. 4, Constitution, exceptions are contemplated, such as the exception, supra, pertaining to apportionment, which accentuates the power and duty of the judiciary. Thus the framers of the Constitution of Oklahoma were of the Websterian view.

Nothing is more essential to free government than an independent judiciary to afford relief to the citizen in the event of governmental invasion or omission as to the inalienable rights of man. Property and the life of every citizen may become subject to its judgment, and the protecting power is needed to strengthen government too. Not a contract is made except in reliance upon the court's ability to afford redress if it is violated. Men part with property upon the promise of their fellows, walk the streets by day and sleep in peace at night in confidence that the silent and unseen power of the judiciary is ready to protect their rights. People of the State of New York v. Howland, 155 N. Y. 270, 41 L. R. A. 838; State ex rel. King, Atty. Gen., v. Rowe, 149 Okla. 240, 300 P. 727.

"Checks and balances," said Mr. Justice Brandeis in Myers v. United States, 272 U. S. 107, 71 L. Ed. 160, "were established in our 'government in order that this should be 'a government of laws and not of men.' "

To prevent abuses, the barons wrested from King John at Runnymede the various guaranties of the Great Charter and stipulated therein "Right shall not be sold, delayed or denied," and that the King should appoint "justiciaries, sheriffs and bailiffs of such as know the law of the land and are disposed duly to observe it." Reeves' History of English Law, 471. So, too, to prevent abuses, the Constitution provided for a judiciary to be manned by men as independent as the lot of humanity would afford and charged the supreme judicial agency with the duty of exercising a particular jurisdiction and, when warranted by the facts, affording relief to any citizen who sought a review of statutes providing unequal and unjust legislative apportionment.

The basic idea of State Constitution is a popular representative government, the officers being mere agents, not rulers of the people—one where no man is so high as to be above the Constitution, and no one so low as to be beneath its protection. Evans v. Foster, 1 N. H. 374.

576

Shall the illuminating precedents of history ever be forgotten, shall the landmarks of the fathers and the lighthouses planted upon the shore upon which other states have floundered, be turned away? Are the secrets of the old Doomsday Books of the Anglo-Saxon to be read in vain? Or, as a part of the administration of right and justice, shall speedy and certain remedy be afforded for every wrong?

If the day shall ever come when the disappointed and disgruntled suitors gather with political demagogues to bid the judges come down from the judgment seat to answer the excited multitude for mere error of judgment, and to plead to their mercy rather than to justice under the law, the safeguards of the Constitution will be trampled underfoot, this will cease to be a government of laws and become a mere aggregation of the people, where law is not the rule of life, in the State of Oklahoma the hour of low twelve will have struck. No longer will the Constitution be administered under the slogan "Let the people rule" that ushered statehood into a happy existence, with officers chosen by popular vote in lieu of government from afar. If and when, as a result of our action, this ceases to be a government republican in form, and our state again becomes subject to federal control or a part of the public domain (sec. 4, art. 4, Federal Constitution), it might well be petitioned to return the commonwealth to the Indians, such as the Cherokees, who under the laws of the Civilized Tribes with bicameral legislative system denominated the House of Kings and Warriors, had government responsive to the needs of the red man.

By the words employed in the constitutional provision, it is everlasting. Had there been no subsequent legislation upon the subject, undoubtedly it would have governed. As found by the majority opinion:

"While several acts altering or creating individual senatorial districts have been passed, the majority of senatorial districts created by the Constitution remain unaltered."

The 18th Legislature did agree as to reapportionment of the Second senatorial district, embracing Roger Mills, Ellis, and Dewey counties, under one division, and Beckham county under another, which were made into nominating districts. Senate Bill No. 167, Title 14, ch. 2, Session Laws 1941. It did agree as to the Sixth senatorial district, consisting of Washita, Kiowa, and Custer counties, each of which were changed into senatorial nominating districts. Senate Bill No. 275, Title 14, ch. 2a, Session Laws 1941, page 38. It did agree as to House Bill No. 458, Title 14, ch. 3, Session Laws 1941, page 39, purporting to create a Thirty-Sixth senatorial district embracing the counties of Murray and Johnston (sec. 2). By section 1 of the act the Eighteenth senatorial district was confined to Carter county and the Twenty-Sixth senatorial district was confined to Love and Marshall counties. It is likely that the enactments are void as contravening section 9, art. 5, Constitution, which specifies that the Senate shall consist, except as hereinafter provided, of not more than 44 members, and with subsequent provisions allowing an increase at the time of subsequent apportionment, but restricting the increase in number to the population of counties entitled to three or more Senators, and with a subsequent provision to require the whole state to be apportioned at one time and not otherwise (sec. 10 [b]).

However, there has been no sufficient subsequent legislation upon the subject as confined to senatorial apportionment.

It is an anomaly to say that a provision of the Constitution itself is unconstitutional, or that invalid laws may destroy the operation and effect of an apportionment, or any other section of the Constitution. The exercise of the original right to establish a government is a very great exertion and ought not to be frequently repeated. The principles, therefore, as established in the written Constitution are fundamental

and as the authority from which these fundamentals proceed is supreme and can seldom act, they are designed to be permanent.

"The Constitution is either 'a superior paramount law' unchangeable by ordinary means, or it is on a level with ordinary legislative acts and like other acts is alterable when the Legislature shall please to alter it. If an act of the Legislature repugnant to the Constitution is void, does it notwithstanding its invalidity bind the courts and oblige them to give it effect?" Marbury v. Madison, supra.

If, then, the courts are to regard the Constitution as, and the Constitution is, superior to any ordinary act of the Legislature, the Constitution and not such ordinary acts must govern the case to which they both apply.

Those, then, who controvert the principle that the Constitution is to be considered in court as a permanent law and enforced as such, are reduced to the necessity of maintaining that courts must close their eyes on the Constitution and see only the law, or allow a political equation to govern a cause in court and require a litigant of rights to await relief by a delinquent department that will be in the anomalous situation of adjudging its own delinquency, or to await action of the people. This doctrine would subvert the very foundation of all written Constitutions. It would be to declare that an act which, according to the principle and theory of our government, is entirely void, is yet in practice completely obligatory. Quo warranto cannot be used to afford petitioner relief because he has not seen fit to make the individual legislators parties to this proceeding. It is their right to office that is measured by the proceeding, and they are necessary parties. Nor is the issuance of the injunctive writ necessary to restrain the State Auditor or the State Treasurer from paying salary or mileage claims to members of the 19th Legislature, because that Legislature has adjourned sine die, and having done so, no per diem or mileage claims are likely to be filed or paid. See

Blackburn v. City of Oklahoma City, 1 Okla. 292, 31 P. 782.

However, according to some authorities, the elective franchise is property, but whether it be or not, it is certain that the ballot is the mode by which laws are to be made, and that laws regulate property rights and so affect property. Warsoff's "Equality and the Law," page 78.

In Doss Oil Royalty Co. v. Texas Co., 192 Okla. 359, 137 P. 2d 934, we said that a plaintiff is not required to name the theory upon which he seeks relief, but "he is entitled to any relief which the facts may justify."

There is some doubt as to whether the present Legislature can now change the apportionment provided, not because the duty does not continue upon failure of the 18th Legislature charged with the duty, but because of the adjudication of this court that there are no legislative offices. After challenge, even the acts of a de facto officer will not be valid. By the majority judgment, there is no such officer. If new and valid legislative districts are not provided by the initiative power reserved in the people, mandamus, being the proper writ, ought to issue, "since the purpose of the proceeding is to control the conduct of public officers" (the chairman, members and Secretary of the State Election Board who are parties to this action) "in the performance of public duties." The writ should issue, commanding affirmative action (Attorney General v. Secy. of Commonwealth, 306 Mass. 25, 27 N.E. 2d 265), to provide for ensuing elections to legislative offices under the 1941 statute as to the House of Representatives and under the constitutional provision as to the Senate.

If a democracy is so decadent and subject to habitual and perpetual fundamental errors that it nor the people indulging such governments cannot or will not exert a corrective influence, it ceases to be a democracy, to become something else in the form of an oli-

**578**

garchy or a monarchy under the rule and heel of dictators.

The late Mr. Justice Swindall, in extending remarks upon the ballot, made use of these words:

"A weapon that comes down as still
  As snowflakes fall upon the sod;
But executes a freeman's will,
  As lightning does the will of God;
And from its force, no doors nor locks
Can shield you: 'tis the ballot-box."

ARNOLD, J., concurs herein.